BOWRING *et al.* v. THEBAUD *et al.*

*(District Court, S. D. New York. July 22, 1890.)*

1. GENERAL AVERAGE—PERIL—DELAY—NO DANGER TO SHIP OR CARGO.
    The primary requisite for a general average charge is some peril common to ship and cargo; next, some sacrifice, or some expense voluntarily incurred by one part interest, beyond that chargeable to it by law, for the safety of the whole. The nature of the requisite peril is some threatened physical injury, not mere delay or loss of expected profits, nor the mere prosecution of the voyage, where no danger to ship or cargo has arisen.

2. SAME—WARRANTY OF SEAWORTHINESS WHEN SHIP SAILS.
    A carrier by sea, under his implied warranty of seaworthiness, is bound to have his ship seaworthy at the time she sails. He, and not the shipper of the goods, takes the risk of accident to the ship while loading, and is legally chargeable with the whole burden of repairing.

3. SAME—ACCIDENT WHILE LOADING—REPAIRS—EXPENSE OF DOCKING.
    The ship T., while loading at New York, along-side the wharf, after returning from a voyage to Mexico, was found when nearly loaded with her forward compartment full of water, arising from a hole in one of the plates, from some cause unknown. A tight bulk-head protected the cargo from injury, or danger of injury. For the purpose of repair, she was docked with her cargo on board to avoid the

greater expense of unloading; and, after the repairs were completed, she finished loading, and sailed on her voyage. An average bond was given by the cargo owners to pay any average charge that might be due from them. On the facts, it being found that the ship was seaworthy when the loading began, and that the hole was made through some harbor peril during the loading, *held*, that neither the repair, nor the expenses of docking, nor any part of either, was a general average charge on the cargo, (1) because, notwithstanding the hole, there was no peril whatever to either the ship or cargo; (2) because there was no extraordinary expense incurred by the carrier, beyond that which devolved on him by law to pay, under his implied warranty of the seaworthiness of the ship at the time of sailing, and hence no act of sacrifice on his part for the common safety; (3) that the case presented no analogy to that of repairs in a port of refuge, since in the latter the general average allowance is founded solely on a deviation, as an act of sacrifice, made in order to avoid a common peril arising after the voyage had begun, and here there was no voyage begun, and no deviation, peril, or sacrifice; and the libel was dismissed.

(*Syllabus by the Court.*)

In Admiralty. Libel to recover assessment under a general average bond.

*E. B. Convers*, for libelants.

*Carter, Rollins & Ledyard*, for respondents.

BROWN, J. On the 10th July, 1885, while the steamer Thorne Holme was lying at Union Stores, Brooklyn, loading with a cargo of grain, her fore-peak was found to be full of water, from a cause unknown. Before proceeding with the voyage, it was necessary to repair her, and for that purpose to place her in the dry-dock. She was nearly fully loaded; and, to avoid the large expense of unloading and reloading the cargo, it was agreed that she should be docked with her cargo in her. The respondents were owners of the cargo, and were insured in the Atlantic Mutual Insurance Company. The arrangement of docking the vessel for repairs, with her cargo in her, was made upon consultation with the underwriters, and with their approval. Upon docking her, a hole, oval in shape, was found through one of her iron plates on the port bow, about nine inches by twelve. Repair was made by placing over the hole an iron patch the whole width of the streak, securely bolted, so as to make the ship as seaworthy as before. After the repair the loading was completed, and the vessel sailed upon her voyage. An average bond, dated 18th July, 1885, and approved by the underwriters, was executed by the respondents, which recited that, "through recommendation of survey, the vessel was put in dock, with the cargo in her, in order to save the expense incident to the discharge and the extra handling of the cargo, * * * by which means certain losses and expenses have been incurred, * * * which may, according to the usage of the port of New York, constitute a general average on the vessel, cargo, and freight;" and the respondents, by said bond, agreed "to pay their part of such loss, damage, or expense as should appear to be due from them, to be stated and apportioned, in accordance with the established usage and laws of this state, by Jacob A. Telfair or others, competent adjuster of marine losses." An adjustment was afterwards made under Mr. Telfair's direction, by which the cargo was assessed for general average $816.05, for which sum this libel was filed. The answer denied that any claim of general average had

accrued; the defense on the original hearing being that the cause of the leak originated on a prior voyage, before the loading commenced; and further, that the repairs made were permanent repairs, and not temporary, for the purpose of the voyage only. Objection was also made to the mode of adjustment.

1.. *The cause of the leak.* If the hole in the bow was made before loading was commenced, plainly, the cargo could not be subject to any average charge for the expense of repairing it, since the carrier was bound to have his vessel seaworthy when loading began, or else take the risk of making her so before sailing. At whatever time this hole was made, the forepeak, which was previously empty, must have been at once filled with water up to the water-line, and the trim and management of the vessel thereby at once seriously affected. There is no direct proof either as to the cause or the time of the injury. There are circumstances on each side that I have found it impossible to reconcile satisfactorily, whichever conclusion be adopted. Without specifying these in detail, I find that the preponderance of probability is in favor of the libelants; that the hole was made while the vessel was loading, and probably upon the 10th of July, the day when it was discovered. The vessel was unseaworthy in that condition; and repair, either permanent or temporary, became necessary. As no negligence by the ship is shown to have been the cause of the injury, and the specific cause is undiscoverable, the damage must be set down to harbor perils. If, upon such facts, the case is entitled to be treated like one arising in a port of refuge, sought in order to make necessary repairs of damages caused by a sea peril, then, according to the law of this country, the docking of the cargo, as an expense substituted in place of unloading and reloading, would be a general average charge, as well as merely temporary repairs of the ship. *Hobson* v. *Lord*, 92 U. S. 397, 407; *The Queen*, 28 Fed. Rep. 755, 760; *The Joseph Farwell*, 31 Fed. Rep. 844; *L'Amerique*, 35 Fed. Rep. 835, 846. Upon the original hearing that phase of the case was not considered. The attention of the court was not called to the question whether, even if the hole in the bow was made after the loading began, the case would or would not be within the principles of general average contribution. It was assumed that it would be. On the reargument, this question has has been exhaustively treated by counsel on each side; and, after much consideration, I have come to the conclusion that the case is not one of general average, but is excluded therefrom by several of the fundamental conditions of that doctrine, and that it would be the same even if the repairs had been merely temporary, and the cargo had been unloaded for the purpose of such repairs, instead of being docked with the ship. No parallel case has been cited; but such analogies as the adjudicated cases afford seem to oppose any average contribution under circumstances like the present. There are three characteristics in this case, all of which seem to me to be vital. In no case in which a general average charge against the cargo has been sustained have I found these three circumstances all concurring, viz.: (1) The absence of any imminent peril common to ship and cargo, and in fact the absence of any peril to either:

(2) The injury and consequent unseaworthiness happening before the vessel sailed, and while she was loading at her dock: (3) No act of sacrifice, properly so called, or anything equivalent thereto, because the carrier's warranty of seaworthiness extended up to the time the ship sailed, and therefore bound him to make and pay for needful repairs up to that time, and all the charges incidental thereto. Repairing was, therefore, not an act of sacrifice. I must infer the absence of any peril to either ship or cargo from the proved circumstances of the case, because there has been no suggestion of actual peril or danger to either, and because there is no indication of danger to either. The fore-peak was filled with water up to the water-line, but this was separated from the cargo by a firm and tight bulk-head; and although the ship was thereby rendered unseaworthy for the voyage until repaired, and was obliged to be repaired before sailing, yet both ship and cargo, so far as the evidence indicates, could have remained at the dock as they were, without injury and in safety, as long as the owner of either desired.

The primary requisite for a general average charge is the existence of some common peril to be averted; next, some sacrifice voluntarily made, or some expense voluntarily incurred, by one part interest, beyond that chargeable to it by law, for the safety of the whole. The quantum of common danger necessary to justify a general average act, *i. e.*, a voluntary sacrifice of a part for the safety of the whole, is not nicely scrutinized. When the sacrifice happens in the course of the voyage, the determination of the amount of danger that requires it is left to the judgment of the master, to be exercised reasonably, and in good faith. Here the voyage had not commenced, and the master's characteristic duties had not begun. The nature of the requisite danger is not that of mere probable pecuniary loss, such as delay in reaching a market, or loss of expected profits, but some threatened physical injury. *"Periculi imminentis evitandi gratia,"* says the ancient statute of Marseilles, (Emerigon, Ap. c. 12, § 39, p. 603,) and such was the Roman law, (1 Pardess. Lois Mar. 107.) Lownd. Av. (6th Ed.) 352. And in text-books and decisions this primary condition of a common peril threatening the safety of the whole is constantly reiterated, (Gourl, Gen. Av.; 2 Lownd. Gen. Av. 39; 2 Arn. Ins., 6th Ed., 855; per Story, J., in *Insurance Co.* v. *Ashby*, 13 Pet. 331, 339; Grier, J., in *Barnard* v. *Adams*, 10 How. 270, 303; *Hobson* v. *Lord*, 92 U. S. 397, 399.) In the case last cited, Mr. Justice Clifford says, (page 399:)

"Property not in peril requires no such sacrifice, nor that any extraordinary expense should be incurred. * * * Where there is no peril, such sacrifice presents no claim for such a contribution; but the greater and more imminent the peril, the more meritorious the claim against the other interests, if the sacrifice was voluntary, and contributed to save the adventure from the impending danger, to which all the interests were exposed."

It is unnecessary to multiply citations. They all import an impending danger of physical injury as the primary condition and initiative of a general average charge. The mere completion of the voyage, where that is in no way necessary to the safety of the cargo, is not sufficient

for a general average charge. That doctrine was expressly repudiated by the supreme court in the case of *Insurance Co.* v. *Ashby*, 13 Pet. 331, and the point was necessarily involved in the decision; for contribution was there allowed for a total loss of the ship by voluntary stranding, although the voyage, also, was wholly lost. STORY, J., says, (page 340:) "It is the deliverance from an imminent impending peril * * * which constitutes the essence of the claim." The Roman law, he says, shows this. "In truth," he continues, "it is the safety of the property, and not of the voyage, which constitutes the true foundation of general average. If the whole cargo were thrown overboard to insure the safety of the ship, the voyage might be lost, but nevertheless the ship must contribute to the jettison." MATTHEWS, J., in *Sonsmith* v. *The J. P. Donaldson*, 21 Fed. Rep. 671, 673. Chancellor Kent says: "Before contribution takes place, it must appear that the goods sacrificed were the price of safety to the rest." 3 Comm. *234. *Royal Mail S. P. Co.* v. *English Bank*, 19 Q. B. Div. 362, 371. In the case of *The Alcona*, 9 Fed. Rep. 172, where the vessel was stranded on the bank of a river, and lay there without danger of serious damage to herself or cargo, it was accordingly held that charges for unloading a part of the cargo in order to lighten and remove her, and for towage services, were not general average. In *L'Amerique*, 35 Fed. Rep. 835, 838, that case was followed by this court. So in the case of *Nesbitt* v. *Lushington*, 4 Term R. 783, where a tumultuous band of famished persons took possession of a vessel in order to obtain her wheat and coals, and the captain was compelled to sell the cargo at a sacrifice in order to regain possession, Lord KENYON held that that was not a case of a general average sacrifice, "because the whole adventure was never in jeopardy," there being "no pretense * * * that the persons who took the corn intended any injury to the ship, or to any other part of the cargo but the corn, which they wanted * * * to prevent their suffering." There could, therefore, be no contribution from the ship. It is upon the same ground that the recent English cases refuse to extend general average charges in a port of refuge, sought in consequence of a sea peril, beyond the time of unloading the ship, because when that is accomplished the cargo is no longer in danger. *Svensden* v. *Wallace*, 13 Q. B. Div. 69, 72-85, 91; *Hallett* v. *Wigram*, 9 C. B. 580; *Royal Mail S. P. Co.* v. *English Bank*, 19 Q. B. Div. 362.

The practice in this country, largely sustained by our courts, is to include in the general average expenses of a port of refuge all extraordinary expenses until the ship regains the high seas, including reloading, and such repairs to the vessel as are merely temporary, and for the purposes of completing the voyage. *Hobson* v. *Lord, supra; The Joseph Farwell*, 31 Fed. Rep. 844, and cases there cited. The libelant contends that the present case is analogous to that class of cases, and that the principles applicable to the Thorne Holme, in this case, are the same as if she had arrived along-side of a wharf in a port of refuge, with a similar hole in her bow, and had taken the same measures for continuing her voyage. But this contention overlooks the ground upon which such charges in a port of refuge could be sustained at all, viz., a previous imminent common

peril, happening during the prosecution of the voyage, and a deviation to the port of refuge as an act of sacrifice, in order to escape the common danger. These circumstances would constitute the foundation, and the sole ground, of the general average claim; but, in the present case, every one of these circumstances is wanting. The English and American courts regard such deviations from the voyage, though caused by a sea peril, as an extraordinary expense, not within the contemplation of the contract of carriage, or the price paid therefor; and, being voluntarily incurred by the master to insure the common safety of ship and cargo from an imminent common danger, such charges are treated as general average. The American courts, contrary to the later English decisions, extend the general average charges in a port of refuge, under such circumstances, to all expenses, save permanent repairs, until the ship regains the high seas, on the view that they are all parts of one continuous operation attached to and consequent on the original act of deviation or sacrifice. But this difference touches one of the most debatable subjects in the maritime law, about which there have been for centuries conflicting views, and in which the practice of maritime nations is very diverse. 1 Pars. Ship. & Adm. 382, 385. Whether the very liberal American practice rests on any sufficient principle, whether it is likely to be modified, as the earlier English decisions have been modified after most careful discussion, or whether even all port of refuge expenses made necessary by sea perils should not be borne by the carrier, as is required in some maritime nations, and as Lord BLACKBURN, in the House of Lords, seemed inclined to think should be the law, (*Svendsen* v. *Wallace*, L. R. 10 App. Cas. 404, 420,) need not be here considered, because, as above stated, all port of refuge cases presuppose a voyage begun, and a common peril to ship and cargo arising in the course of it, to escape which the deviation or sacrifice was made. Here there was neither voyage nor peril nor deviation. The analogy wholly fails in the present case; nor could our doubtful practice as to the broad extent of enforced contribution in port of refuge cases, where there has been an escape from a sea peril, with any propriety be still further extended to port charges incurred before the voyage began, where there has been no peril, and no escape.

2. Under any view of the law of general average, expenses incurred, in order to be treated as a sacrifice, must be such as form no part of the carrier's own obligation. Lownd. Av. 147; 1 Pars. Shipp. & Adm. 382; Gourl. Gen. Av. 18. This is the very point where the authorities divide as to the right of the carrier to make a general average charge for any port of refuge expenses caused by sea perils. Those who disallow such charges hold that the putting into port for safety, and the repair of sea damage, with all its incidents, are parts of the carrier's own risk, included and paid for in the contract of carriage; while the opposite view is that such acts and expenses, save permanent repairs of the ship, are not within the ship's undertaking, but are within the exceptions of perils of the sea, and therefore extraordinary, and outside of the carrier's duty to pay. In the

case of *Dupont de Nemours* v. *Vance,* 19 How. 162, 172, Mr. Justice CUR-TIS says:

"If the sacrifice be made to enable the vessel to perform the voyage by paying what the owners are bound to pay to complete it, the charge is on the vessel and its owners. If it be made to relieve the adventure from a peril which has fallen on all the subjects engaged in it, the risk of which peril was not assumed by the carrier, the charge is to be borne proportionately by all the interests."

How can it be contended in the present case that the risk of any accident to the ship only that might render her unseaworthy while loading, and before breaking ground, was not a risk assumed by the carrier? It is an implied warranty in carriage by sea that the ship shall be seaworthy at the time she sails. . "When she first sails on the voyage," says Lord MANSFIELD in *Bermon* v. *Woodbridge,* 2 Doug. 781, 788. Macl. Shipp. (3d Ed.) 400, 418; Marsh. Ins. (5th Ed.) 109; 2 Am. Ins. 652; *Purvis* v. *Tunno,* 2 Bay, 492; *Cohn* v. *Davidson,* 2 Q. B. Div. 455; *The Eugene Vesta,* 28 Fed. Rep. 762; *Sumner* v. *Caswell,* 20 Fed. Rep. 249, 252; *Crow* v. *Falk,* 8 Q. B. 467; *Valente* v. *Gibbs,* 6 C. B. (N. S.) 270. The risk of such accidents to the ship as this, while loading, falls, therefore, upon the carrier, and consequently the expense of repair, whether temporary or permanent, as well as all the incidental charges connected with it. This was not, therefore, an extraordinary expense, within the meaning of the law of general average, incurred for the benefit of the cargo, or for its safety, or to rescue it from peril. It was one of the carrier's ordinary risks, which he alone was bound to bear. He could not undertake the voyage without making his ship seaworthy at the time she sailed; and his implied warranty of seaworthiness to the cargo owners bound him, therefore, to bear all such charges without calling on the cargo for contribution. The repair of the ship in this case was not in itself, therefore, any act of sacrifice, and there was no other such act. In the case of fire on a vessel at a dock before the commencement of the voyage, where a general average has been allowed, there was not only danger of the loss of both ship and cargo, but also some voluntary act of sacrifice or expense made or incurred to rescue from that danger, such as scuttling, jettison, salvage services, etc., which caused the charge that was distributed as general average. Here nothing of that kind existed. For the above reasons a decree should be entered for the respondents, with costs.