EARNMOOR STEAMSHIP CO. v. NEW ZEALAND INS. CO.

(District Court, N. D. California. April 16, 1896.)

No. 10,287.

1. GENERAL AVERAGE CHARGES—INJURIES TO TUGS.
   Incidental injuries to tugs, such as the breaking of hawsers and the loss of a propeller while engaged in pulling off a stranded ship, under a contract of hiring by the day, are to be deemed as comprehended in the con-

tract price, and cannot be allowed, in making a general average adjustment, against the various interests in the stranded ship and cargo.

2. SAME—ABANDONMENT OF VOYAGE—FREIGHT.

Where various interests in a stranded vessel and cargo, in order to avoid "greater general average expenses," made an agreement for the allowance of the freight to the charterers as a condition of the abandonment of the voyage, *held*, that such agreement was not binding on insurers who had not joined in or assented to it, even though the terms of the agreement would not have prejudiced them.

3. SAME—SALE OF CARGO—FREIGHT.

The abandonment of a voyage, after a stranding at its commencement, and the sale of a cargo of coal, is not such a sacrifice in the face of impending danger of physical injury, as will make the freight a charge in general average. Nor is it sufficient that such cargo must have been stored in barges pending repairs estimated to require 30 or 40 days, with a possibility of being frozen in by approaching winter.

Libel in personam to recover pro rata of a general average adjustment.

Page & Eells, for libelant.

Andros & Frank, for respondent.

MORROW, District Judge. This is an action by the Earnmoor Steamship Company, a British corporation, against the New Zealand Insurance Company, to recover $997.41, as the proportion of general and particular average charged against it by an adjustment made up and presented on July 23, 1889, to the various insurance companies interested in the loss sustained by the perils of the sea to the British steamship Earnmoor, the property of the libelant. The libelant has also brought suit in this court against two other insurance companies,—one, the South British Fire & Marine Insurance Company of New Zealand; the other, the Sun Insurance Company. These two suits arise out of the same subject-matter, and involve the identical questions to be determined in the case at bar. The agreed statement of facts and testimony taken in the case at bar is made applicable to these two additional suits. The facts are, briefly, as follows: On the 1st day of March, 1888, the New Zealand Insurance Company issued its policy of marine insurance for the term of one year from March 8, 1888, whereby it insured Alfred Earnshaw, on account of whom it might concern, in the sum of $1,500 on the steamship Earnmoor, valued as follows: Hull, etc., $89,725; machinery and boilers, $36,375; total, $126,100. On the 19th day of January, 1888, the South British Fire & Marine Insurance Company of New Zealand made a similar policy, whereby it insured on said vessel, on a like valuation, the sum of $5,000. On the 1st day of March, 1888, the Sun Insurance Company made a similar policy, whereby it insured on said vessel on a like valuation, the sum of $5,000. Each of said policies was against the perils of the seas and other usual perils. On January 10, 1889, during the life of the policies above referred to, the ship sailed from Philadelphia on a voyage to St. Thomas, laden with a cargo of coal. She left her wharf about 6 p. m., in charge of a pilot. About three hours later, when near Edgemoor, proceeding down the Delaware river, she struck a sunk-

en rock, and passed over it. She began to fill rapidly, and, to avoid sinking in deep water, was run ashore on the Delaware side. Owing to the water in her forward hold, the vessel was considerably down by the head, and it was impossible to drive her very high on the bank. As a consequence, when the tide rose, her decks were submerged. A diver was employed to stop the leak, and lighters and steamtugs were sent to her assistance, and a considerable portion of her cargo was discharged, whereby the vessel was floated. She was then towed to Wilmington, Del., the remainder of the cargo taken out, and the vessel docked and repaired. After a considerable portion of the cargo had been lightered, it became evident, the vessel still remaining ashore, that the salvage operations and subsequent repairs to the vessel would occupy considerable time. A survey was thereupon held, and, in accordance with its recommendations, in order to avoid greater general average expense, the voyage was abandoned. Her cargo of coal was sold. A general average statement was, in due course of time, made up, and presented to the various insurance companies on July 23, 1889. Objections were raised by the respondent to the general average adjustment. It appears from the general average statement that in the adjustment $43,344.07 was charged to particular average on the vessel, and $44,589.44 was charged to general average, of which $40,510.70 was charged against the vessel, $1,759.15 against freight, and $2,319.59 against the cargo. The libelant now concedes the correctness of all the charges to which he originally objected excepting two, which are as follows: (1) The allowance for damages to the wrecking outfit of Peter Wright & Sons, incurred in the rendering of assistance to the steamship. The amount allowed was $1,012.31, of which sum respondent's share of liability is $12. (2) The allowance of freight paid to the charterers as a condition of relinquishing the voyage. The average adjustment shows that the amount charged to general average as freight was $4,431.90, of which the respondent's pro rata, after the freight has paid its own share in general average, would be about $50. In addition to the agreed statement of facts, the depositions of several witnesses in Philadelphia and New York were introduced.

The objection to the item for damages incurred to the wrecking outfit to Peter Wright & Sons, in rendering assistance to the steamship, is, in my opinion, well taken. Without entering into an analysis of the testimony that bears on this question, it is sufficient to say that, whatever incidental damages the tugs engaged in pulling the Earnmoor off the strand and in righting her may have sustained to their hawsers, and, in the case of the tug Argus, the loss of her propeller, these were deemed to be included and comprehended in the contract price for the services rendered. This was not a salvage service. The tugs were hired at a stipulated sum per day, and there is no question but that this compensation covered ordinary wear and tear resulting from the performance of that service. Evidence was introduced, however, seeking to establish that the contract, which was a verbal one, also provided that the owners

should be compensated for any extraordinary injury that might happen to their tugs while assisting in these wrecking operations. But this testimony is far from being satisfactory. Had one of the tugs been lost while rendering the service, I do not think that it could be seriously contended, under the evidence adduced, that the interests affected by the general average adjustment would be expected to contribute to the loss of the tug. That being so, there is no more reason to assume that the loss of a propeller or of hawsers should be compensated for as an extraordinary expense and as a subject of general average. In other words, in the absence of any clear and unambiguous stipulation to the contrary, the tugs took the risks of these accidents while rendering this service. These risks inhered in the business in which they were engaged. This item will, therefore, be disallowed.

The objection to the item making an allowance as a general average charge for the freight paid to the charterers as a condition of relinquishing the voyage raises a question of considerable difficulty. The agreed statement of facts, the report of the surveyors, and the testimony of some of the witnesses all concur upon the proposition that, in order to avoid greater general average expenses, the voyage was abandoned. To accomplish this end, some disposition had to be made of the freight interest. The ship carrier had the right to do one of two things: either to refit the vessel, or to engage another, and thus earn his freight. Herbert v. Hallett, 3 Johns. Cas. 93; McGaw v. Insurance Co., 23 Pick. 405, 411; Saltus v. Insurance Co., 14 Johns. 138; 1 Pars. Shipp. & Adm. § 6, pp. 231–239. The intake cargo consisted of 2,607 tons of coal. It was accordingly agreed, "for the benefit of all concerned," to abandon the voyage, sell the cargo, pay the freight, and allow it as a charge in general average. This last stipulation is in these words: "That freight at the rate of $1.70 per ton, originally loaded, shall be allowed in general average." The parties who entered into and signed this agreement, which was introduced in evidence, were (1) Alfred Earnshaw, managing owner of the steamer Earnmoor; the Earnline Steamship Company, time charterers of the Earnmoor; the Berwind White Coal Mining Company, charterers for the voyage to St. Thomas; the Berwind White Coal Mining Company, owners of the cargo; the British & Foreign Marine Insurance Company, underwriter on the cargo; and the Western Assurance Company, underwriter on the freight. But the respondent, the New Zealand Insurance Company, was not a party to this agreement, nor was it consulted. The same is true of the other insurance companies, undertakers on the vessel. It does appear, however, that these companies, with the exception of the respondent company and the other companies sued in this court, when advised of the adjustment and the agreement with respect to the allowance of freight as a general average charge, acquiesced in this item. The respondent and the other companies referred to did, however, object to this and other items. It is claimed that they cannot be bound by an agreement to which they were not parties, and which they have not ratified.

The reason given for not consulting the underwriters on the vessel was stated by Alfred Earnshaw, managing owner of the Earnmoor, who was present at the wrecking operations, and superintended them to a large degree, to be "that there were so many of them, and most of them far away, that it would be practically impossible to communicate with them, and obtain their consent." But this reason is not a satisfactory one. The respondents could have been communicated with by cable. Mr. William A. Walker, a witness for the respondent, and advisory agent in New York of the three companies proceeded against, testified that when advised of the disaster to the Earnmoor, he sent Mr. Frank S. Martin, an expert mechanical engineer and naval architect, to oversee the repairs, and report to him in New York. Mr. Martin made several reports, but never advised Mr. Walker of the agreement in question. The latter was not aware of any such arrangement until the statement of the adjustment was submitted to him by Martin, when he then objected to this and other items. Martin testified that he had participated in making up the adjustment, but he states positively that he had nothing to do with the discharge of the coal, nor with the compromise under which it was sold, and freight allowed. The other witnesses testify that the agreement made was in every respect a proper and reasonable one; that it resulted in the saving of greater general average charges. . How much it would tend to save does not clearly appear. Mr. Walker, the representative for the insurance companies who object to this item, admits that the charge for freight would have been "fairly put in that adjustment as to parties who consented to the same, but, as to parties who refused to pay the same, they were at liberty to go without paying it, if we made such a case." The repairs, it is stated in the adjustment report (page 34), would take from 40 to 60 days. It was testified that during this time the cargo of coal would have to be stored on barges, and that there was some danger of the river being frozen up by the approaching cold weather. How imminent this danger was does not appear, but it was referred to by some of the witnesses as a reason, among others, for selling the coal. The expenses which, it was testified to, would be saved by the sale were expenses connected with the storing of the cargo on barges while the repairing was going on and of reloading. It also appears that the cargo, being somewhat damaged, would sustain further injury and loss by being stored, reloaded, and forwarded in its damaged state. What this would amount to was not testified to. The intake of 2,607 tons was valued at $2.60 per ton, or the sum of $6,492.85. It seems that 109¾ tons were totally lost by the accident. The remaining 2,497¼ tons were sold for $5,319.35, being $1,173.50 (18.15 per cent.) less than cost. Now, while it would seem from this statement of the facts that the sale was justified as a matter of convenience and sound business sense, yet the question arises whether, in the absence of any assent to this sale and the charging of freight as general average, the respondents are bound by it. I am clearly of the opinion that they are not bound by the agreement, not having been parties thereto, nor having ratified

the same. While it may be that the terms of the agreement would not have prejudiced them in any substantial degree, and while it was probably the best thing that could have been done under the circumstances as an economical measure, still the fact remains that it was not agreed to by the respondents, and their rights in this regard must be respected.

The next inquiry is whether this item can be allowed upon principles which obtain in determining general average. The well-settled rule of the admiralty law is that, to entitle the carrier ship to full freight, the cargo must be transported to its destination, and be ready for delivery. The only exception is where the nonarrival has been occasioned by the default or waiver of the shipper. The Nathaniel Hooper, 3 Sumn. 542, Fed. Cas. No. 10,032; Drinkwater v. The Spartan, 1 Ware, 149, Fed. Cas. No. 4,085; Herbert v. Hallett, 3 Johns. Cas. 93; Saltus v. Insurance Co., 14 Johns. 138; Clark v. Insurance Co., 2 Pick. 104; McGaw v. Insurance Co., 23 Pick. 405; Luke v. Lyde, 2 Burrows, 882; Anderson v. Wallis, 2 Maule & S. 240; The Gazelle and Cargo, 128 U. S. 474, 9 Sup. Ct. 139. However, in this case, the shipper did waive further transportation by the agreement referred to. But, confessedly, this waiver is insufficient to make this allowance of freight a general average charge, and the respondents liable as undertakers on the vessel, if the element of sacrifice is lacking. In Insurance Co. v. Ashby, 13 Pet. 331, it was held that the safety of the property, not that of the voyage, constituted the foundation of general average; and in McAndrews v. Thatcher, 3 Wall. 347, it was declared that neither goods nor any interest are liable to contribute in general average for any sacrifice or expenses incurred subsequent to ceasing to be a risk. It is also the well-settled rule that the sale of a cargo as a matter of convenience and from prudential considerations merely will not be sufficient to make the payment of freight a general average charge. The reason of the rule is that there cannot be said to be any element of sacrifice unless made in view of some present danger. The whole subject is discussed by Judge Brown in Bowring v. Thebaud, 42 Fed. 797, with his usual clearness:

"The primary requisite for a general average charge is the existence of some common peril to be averted; next, some sacrifice voluntarily made, or some expense voluntarily incurred, by one part interest, beyond that chargeable to it by law, for the safety of the whole. The quantum of common danger necessary to justify a general average act—i. e. a voluntary sacrifice of a part for the safety of the whole—is not nicely scrutinized. When the sacrifice happens in the course of the voyage, the determination of the amount of danger that requires it is left to the judgment of the master, to be exercised reasonably and in good faith. * * * The nature of the requisite danger is not that of mere probable loss, such as delay in reaching a market, or loss of expected profits, but some threatened physical injury. 'Periculi imminentis evitendi gratia; says the ancient statute of Marseilles (Emerig. Ap. c. 12, § 39, p. 603), and such was the Roman law (1 Pard. Lois Mar. 107). Lown. Av. (6th Ed.) 352. And in text-books and decisions this primary condition of a common peril threatening the safety of the whole is constantly reiterated. Gourl. Gen. Av.; 2 Lown. Av. 39; 2 Arm. Ins. (6th Ed.) 855; per Story, J., in Insurance Co. v. Ashby, 13 Pet. 331, 339; Grier, J., in Barnard v. Adams, 10 How. 270, 303; Hobson v. Lord, 92 U. S. 397, 399. In the case last cited, Mr. Justice Clifford says (page 399): 'Property not in peril requires no such

sacrifice, nor that any extraordinary expense should be incurred. \* \* \*
Where there is no peril, such sacrifice presents no claim for such a contribu-
tion; but the greater and more imminent the peril, the more meritorious the
claim against the other interests, if the sacrifice was voluntary, and con-
tributed to save the adventure from the impending danger, to which all the
interests were exposed.' It is unnecessary to multiply decisions. They all
import an impending danger of physical injury as the primary condition and
initiative of a general average charge. The mere completion of the voyage,
where that is in no way necessary to the safety of the cargo, is not sufficient
for a general average charge."

In the case at bar there was no impending danger of physical
injury to the cargo of coal. There was some evidence to the effect
that while the repairs would be going on the barges might be
frozen in by the approaching cold weather. But the testimony in
this regard was not sufficiently satisfactory to justify the court
in finding that there was an "impending danger of physical injury"
to the cargo of coal by reason of frosts which, perhaps, might set
in. The danger must be present and imminent, and the sacrifice
made in good faith by reason of, and for the purpose of averting, that
danger. In the case of McGaw v. Insurance Co., 23 Pick. 405,
which was an action against the insurers of the freight, it appeared
that the vessel met with an accident on the 16th of June, 1836, and
was ready to take a cargo, after having been repaired, on November
1st of that year. On the 1st of August, 1836, a month and a half
after the accident, the consignor of the cargo required the master
of the vessel to send forward or deliver up the sound portion of the
cargo forthwith, and the master, believing that he could not repair
his vessel in a reasonable time, yielded to the request. The court,
through Chief Justice Shaw, held that the master should not have
delivered up the cargo without the payment of freight, and that,
therefore, the loss of the particular freight insured was caused by
the voluntary act of the insured, and not by any of the perils in-
sured against. In the course of the opinion the learned justice
said:

"It is now well settled by a series of cases that if a vessel is damaged by one
of the perils insured against, and in consequence thereof is obliged to put
back, or seek a port of refuge, and unlade and repair, the master, if he can
refit his ship and proceed in a reasonable time, may retain the cargo, and
carry it to its place of destination, and will then earn his full freight. \* \* \*
And it makes no difference in this respect that by such detention and re-
tardation of the voyage the arrival of the cargo at the place of destination
will be so late as to disappoint the purposes of the shippers by the change
of the season, loss of market, or otherwise. It is not within the scope of the
insurer's contract that the vessel or cargo shall arrive at any particular time,
but only that the vessel shall not be prevented from proceeding to the port of
destination and carrying the cargo by any of the perils insured against.
Nor does it make any difference if the cargo is damaged, and unfit to be
shipped, if it remains in specie, and can be carried to the port of destination,
as the shipowner is not responsible for the damaged condition of the goods,
whether such damage arise from a principle of internal decay or from perils
of the sea. In such cases it is held that, as between the shipper and ship-
owner, the latter is entitled to his freight, although the goods have become
utterly worthless; and that he has his remedy for his freight, not only by
a lien upon the goods (which, in the case supposed, would avail him nothing),
but also by an action against the shipper on his contract for the carriage.
\* \* \* Whether the vessel can be repaired and made ready to take the

cargo within a reasonable time is a question which must depend much upon the circumstances of the case, such as the place where the vessel is, or can readily be brought to, whether labor and materials can be readily had or promptly obtained; and this must be determined by consideration applicable to the vessel alone, and will not be influenced by the consideration that the cargo will be deteriorated by the delay, or lose the proper season for a favorable market, or for a particular sale which the shippers have in contemplation."

After alluding to the peculiar circumstances of the case in hand, the learned justice continued:

"Under these circumstances it might be the wisest and most judicious course, and most beneficial to the owners, for the master to give up the cargo thus partially lost and damaged, and not attempt to earn a freight upon the transportation of these particular goods, at the cost which it would have required; when his vessel could be employed as beneficially, or more so, elsewhere, as soon as she could be put in a condition to be employed at all. He might even have an offer for a better freight elsewhere, when this cargo was delivered up. But it follows, as a necessary consequence, that if the voyage on which freight was insured by the defendants was relinquished upon prudential considerations, when it might have been prosecuted, and the freight earned, the loss of the particular freight thus insured was caused by the voluntary act of the assured and their agents, and not by any of the perils insured against."

Such being the law declared by high judicial authority, it is difficult to see how, under the circumstances of this case, the allowance of freight as a general average charge, in pursuance of the agreement referred to, can be justified. It is true that in Insurance Co. v. Ashby, supra, it was held that the freight of a vessel, totally lost, by being run on shore for her preservation and that of the crew and cargo, ought to be allowed to the owner of the vessel as a subject of general average, the cargo of the vessel having been saved by the stranding. But, in the case at bar the vessel was not totally lost, nor does it appear affirmatively that the cost of repairs would have been so great as to amount, in the law of marine insurance, to a constructive total loss. She could have been repaired within a period lasting from 40 to 60 days, and have then proceeded on and completed her voyage. The further question arises incidentally whether this period of time should be considered reasonable. What amounts to a reasonable time within which to refit or repair is, manifestly, a question depending upon the facts of each individual case. It is one relative to the circumstances and situation in which a particular vessel and her cargo are placed. As was said by Kent, J., in Herbert v. Hallett (page 98):

"What is convenient time to refit must depend upon the particular voyage to be performed, and the time and place of the accident. No definite time is prescribed, nor does the matter appear to be susceptible of any definite rule. Under the circumstances of the present case, I cannot undertake to say that two weeks was an unreasonable time, and that the verdict ought, for that reason, to be set aside."

I do not think that a period of 40 to 60 days can be considered, under the circumstances of this case, unreasonable.

The question of freight pro rata itineris can hardly be said to arise in this case. The distance traveled, after leaving Philadelphia, when the accident happened, was only 30 to 40 miles. The vessel

was bound for St. Thomas, Danish West Indies. The service rendered to the shipper cannot, therefore, have been productive of any substantial benefit. As stated in McGaw v. Insurance Co. (page 412), the "shipowner could obtain no freight pro rata itineris, because no substantial or beneficial part of the transportation of the goods had been accomplished." See, also, Herbert v. Hallett, supra. The item of freight as a general average charge will therefore be disallowed.

A decree will be entered in accordance with this opinion.