George **LEGNOS** and John Gorman, Jr., Plaintiffs-Appellants,

v.

**M/V OLGA JACOB,** her engines, tackle, etc., **Schiffahrtsgesellschaft Jacob and Co.,** Claimant of the M/V Olga Jacob, **Flensburger Dampfer-Compagnie,** and United States of America, Appellees-Appellants,

v.

**ELLER AND COMPANY, INC.,** Defendant-Appellee.

No. 73-2525.

United States Court of Appeals, Fifth Circuit.

Aug. 12, 1974.

Rehearing and Rehearing En Banc Denied Oct. 22, 1974.

David P. Karcher, Miami, Fla., for Eller & Company.

John Briggs, U. S. Atty., Jacksonville, Fla., Oscar Blasingame, Asst. U. S. Atty., Tampa, Fla., Alfred Boudreau, Jr., Asst. U. S. Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for U. S. A.

James A. Dixon, Jr., Miami, Fla., James O. Davis, Jr., Tampa, Fla., for George Legnos and John Gorman, Jr.

Morton Hollander, Ronald R. Glancz, Dept. of Justice, Civ. Div., Washington, D. C., James F. Moseley, Jacksonville, Fla., for Flensburger Dampfer-Compagnie and others.

Dewey R. Villareal, Jr., Tampa, Fla., for Schiffahrtsgesellschaft.

Neil H. Koslowe, Atty., App. Section, Civ. Div., Dept. of Justice, Washington, D. C., for appellees.

Appeal from the United States District Court for the Middle District of Florida.

Before BROWN, Chief Judge, and TUTTLE and SIMPSON, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Appellants Legnos and Gorman filed a complaint *in rem* against the M/V OLGA JACOB and *in personam* against the shipowner, the charterer, and the United States, as owner of the cargo seeking salvage award. The District Court found that the services rendered by the appellants in helping to extinguish a fire on board the M/V OLGA JACOB, did not entitle them to a salvage award since neither the vessel nor the cargo had been imperiled by the fire. The District Court's decision that the ship was not in peril due to the contained nature of the fire and the readiness of local fire officials was unsupported, and we therefore vacate that portion of the District Court's decision and remand. On a cross appeal challenging the District Judge's decision that he could not determine the origin of the fire, we affirm on the ground that this finding was not clearly erroneous.

### The Fire

M/V OLGA JACOB was docked in Port Canaveral, Florida, to take on a cargo of sophisticated military equipment including rocket launchers, trailer vans, CONEX containers and various component parts to the missile system destined for the Republic of West Germany.[1] On February 16, 1971 Legnos and Gorman were on board working as superintendent and assistant superintendent for Eller and Company, the contracting stevedore in charge of loading the cargo. In the evening, after the loading was nearly complete, fire and smoke were reported coming out of No. 5 hold. Legnos and Gorman were working elsewhere on the ship at the time the fire was reported but quickly went to No. 5. Gorman obtained a ship's light and accompanied Legnos into No. 5 in the successful attempt to locate the fire.[2]

---

1. Prior to arrival in Port Canaveral, M/V OLGA JACOB had taken on a partial load of baled wood pulp and rolls of liner board distributed throughout its five holds and forming the bottom load in No. 5 lower hold. Both these materials were highly combustible.

2. As Legnos and Gorman entered the hold alone their testimony is verbally uncontradicted as to the fire discovered. Their brief describes it:

> They proceeded on below into the lower No. 5 Hold, carrying a cluster light where they advanced through the maze of chains, lashing and equipment and observed a fire blazing in the forward port portion of the lower No. 5 Hold at the brow of the stow of the wood pulp and liner board. The fire appeared to be intense and blazing in a pillar like "a flame thrower". Legnos and Gorman were driven back by the heat and smoke and returned to deck. Legnos then ran to the Captain's cabin to notify

Upon being notified of the fire, the ship's master ordered that the weather deck hatch cover on No. 5 be closed to cut off any ventilation to the hold. In addition 55 flasks of $CO_2$ gas were released into the hold in an attempt to control and extinguish the fire. During this time the Pan American Fire Department, service contractors to the base, and the local Cape Canaveral Fire Department arrived on the scene and were on ready standby.

No further action was taken until the next morning (February 17) when the ship's officers, local fire officials, military and civilian representatives of the base, the German Government and marine surveyors for the vessel's underwriters and classification societies held extensive discussions. The master was of the view that the hold should be flooded with water and about this time declared a General Average. Whether his views were sought or not Legnos took an active part in these discussions in which he emphasized the damage that would be done by such method to this highly valuable military cargo.[3] Included in the group was a chemist from the base whose testimony revealed that the atmosphere in the hold was lethal without sustaining Scott life packs. He was also concerned that even though there was no visible evidence of continuing fire (e. g., smoke, etc.) there was an acute danger of explosion were the hatches to be opened.

It was decided that someone should descend into hold No. 5 to determine if the fire was still alive. Legnos volunteered at this time to descend into No. 5 with a Cape Canaveral or Pan American fireman in order to locate the smoldering fire. Both Legnos and the fireman wore an air pack with breathing apparatus which Gorman helped operate from the deck. On getting into the lower hold

the two observed that the fire was still smoldering.

On receipt of this information it was decided with the master's approval to use foam, then available in the local fire fighting vehicles on the dock. Legnos in the company of one or more firemen went into the lower hold with foam hoses and put the foam on the smoldering area. Gorman in the meantime was on deck handling lifelines to the men below. It was then determined that the deck hatch cover should be removed and the cargo stowed on the tween deck hatch cover so that foam could be put into the lower hold through the hatch opening. Legnos and Gorman wearing airpacks (although some ship crew members were not) went down into the tween deck which still had smoke in it. They hooked onto a rocket launcher and later assisted crew members in removing the tween deck hatch cover.

The firefighters thoroughly foamed down the lower hold and the fire was extinguished with only minor damage to cargo or ship.

### Marine Peril

■ There are three elements which must be shown for a valid salvage claim: (1) a marine peril, (2) service voluntarily rendered when not required as an existing duty or from a special contract, and (3) success in whole or in part, or that the service rendered contributed to such success. The Steamboat Mayflower v. The Steamboat Sabine, 1880, 101 U.S. 384, 25 L.Ed. 982. M. Norris, The Law of Salvage § 63.

The District Judge denied any salvage award to the salvors based on his finding that "there was no peril reasonably to be apprehended with respect to the vessel or her cargo such as would entitle the plaintiffs to a salvage award." The

him of the fire while Gorman and a member of the ship's company descended into the lower No. 5 Hold again carrying fire extinguishers. Gorman and the crewmen were only able to proceed a few feet from the base of the ladder due to the intense

heat and dense smoke and therefore retreated to the deck.

3. The Court never got to values but the salvors claimed the military cargo was worth 60 million dollars.

District Judge based his conclusion on the fact that the vessel's crew and the local fire fighter groups acted promptly and efficiently to extinguish the fire and that there were more than adequate numbers of competent fire personnel on the scene and the fire was successfully extinguished.

But we cannot accept this finding based as it is upon an erroneous application of controlling law which takes our review out of the usual Plimsoll line standard of F.R.Civ.P. 52(a).

A non-friendly[4] fire aboard ship so long as it remains unextinguished is a classic case of marine peril. With flammable materials almost everywhere, passages and spaces where natural convection readily permits a small smoldering to break out in a blazing fury, the history of the sea attests to fire as a cause of some of the most catastrophic of marine disasters. See, the *Morro Castle* and Texas City Disasters.[5]

*Norris,* supra, synthesizes the life, the experience of the sea and sea law when he states:

> "It is difficult to conceive of a fire aboard ship which does not place the vessel in peril. The fire may be trivial but if aid is required or requested and given which aid extinguishes or contributes toward the eventual extinguishment of the fire, a salvage service has been performed." M. Norris,

The Law of Salvage, § 64 (1958), see also §§ 20, 21, 22.

And so it was here. The bottom of the lower hold where the fire started and burned contained highly combustible materials. Had the fire not been extinguished it was just a question of time until the fire would have spread throughout the hold. Although use of $CO_2$ was helpful, the fire continued on the morning of February 17. This led to serious consideration of the use of the drastic step of flooding the hold—drastic at least in the sense of extensive damage to technical military devices of huge value.

█ It was at this time that the master put the sea law's imprimatur on *peril* by declaring a General Average which as one of its principal ingredients requires the existence of a common peril to the venture. Orient Mid-East Lines, Inc. v. A Shipment of Rice, 5 Cir., 1974, 496 F.2d 1032; Barnard v. Adams, 1850, 51 U.S. (10 How.) 270, 13 L.Ed. 417.[6]

But there was much more than some act with conclusory consequences. In rejecting the proposal to flood the hold it was decided to explore the use of foam. The presence of $CO_2$ presented risk to both life and of explosion. The peril from the continued burning of the fire was great enough to risk the peril to life as Legnos and one or more firemen entered the hold with life packs. This inspection was followed by some re-

---

4. Borrowing a term from the insurance field, a "friendly" fire would be, e. g., a galley stove, fire under the ship's boilers, etc.

5. *Morro Castle* Disaster: United States v. Abbott, 2 Cir., 1937, 89 F.2d 166, 1937 A.M.C. 533; Hyman v. Pottberg's Ex'rs., 2 Cir., 1939, 101 F.2d 262, 1939 A.M.C. 121; Petition of Agwi Navigation and New York & Cuba Mail S. S. Co. for Limitation of Liability, S.D.N.Y., 1939, 1939 A.M.C. 895; New York & Cuba Mail S. S. Co. v. Continental Ins. Co. of City of N. Y., S.D.N.Y., 1940, 32 F.Supp. 251, 1940 A.M.C. 366.
Texas City Disaster: In re Texas City Disaster Litigation, 5 Cir., 1952, 197 F.2d 771, aff'd sub nom., Dalehite v. United States, 1953, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427, 1953 A.M.C. 1175; Republic of France

& Compagnie Generale Transatlantique v. United States, 5 Cir., 1961, 290 F.2d 395, 1961 A.M.C. 1082.

6. "[T]o constitute a case for general average, three things must concur:
   1st. A common danger; a danger in which ship, cargo, and crew all participate; a danger imminent and apparently 'inevitable', except by voluntarily incurring the loss of a portion of the whole to save the remainder . . ." 51 U.S. at 303, 13 L.Ed. at 431. See N. Healy and B. Currie, Admiralty 643, 644.
   As we read the record, declaring General Average was triggered by the likelihood of flooding the hold with its inevitable damage to valuable cargo.

turning to put foam on the still smoldering fire. But the risk to cargo and ship was not yet thought to be over so the steps were taken to clear the tween deck hatch square to permit full access to the lower hold for a complete foaming.

With all of these efforts by all hands participating, the fire was out. The peril was gone. But it had been there up to the moment of success.

The finding of no peril must be rejected, not on ordinary notions of F.R. Civ.P. 52(a) clearly erroneous standards, but because we think the Judge was laboring under principles which were incorrect or confused peril with other distinguishable elements of marine salvage.

■ The Judge's principal mistake was in confusing the *necessity* for the claiming salvors' services with the existence of peril. And as a correlary of this he felt that Legnos and Gorman had not done anything the other firefighters would not have done.

Thus, as to the first, the Judge emphasized the calmness with which the master went about determining what to do, the efficiency and competence of those in charge of the two fire departments and the sufficiency of their actions without the need for outside help.[7] But these factors have little to do with peril. Indeed, it was the need for these firefighters and the efficient work performed by them which proves the existence of peril. The use of $CO_2$ might have been enough, but the continuation of the fire on the morning of the 17th led to the collective judgment that more was needed—either flooding or foaming—to eliminate the risk that the fire might break out and spread through the combustible cargo.

■ In this approach the Judge was also navigating under the mistaken notion that for salvors to establish peril they must prove that their actions were *necessary* to eliminate or alleviate such condition. The law of salvage makes no such demand. Indeed such a notion would be at odds with the humanitarian principles symbolized by the law of salvage which encourages all to render aid in the face of marine peril. Grigsby v. Coastal Marine Service of Texas, Inc., 5 Cir., 1969, 412 F.2d 1011, 1021, 1969 A. M.C. 1513. See M. Norris, The Law of Salvage § 232 (1972), quoting Brown, C. J.

■ It is a question of making a contribution—not the performance of actions or the furnishing of services supplied by no one else. This is clear from the century proved decision in The Blackwall v. Sancelito Water and Steam Tug Company, 1869, 77 U.S. 1, 19 L.Ed. 870, in which the Supreme Court stated that "all who engage in the enterprise and materially contributed to the saving of the property, are entitled to share in the award which the law allows for such

---

7. This was reflected by the informal colloquy on post-evidence arguments which are frequently more revealing than austere post-trial formal findings:

Mr. Dixon: [counsel for appellant salvors]
If I could gather from the Court the specific point that you feel we have failed to prove, in terms of—
The Court:
Peril.
Mr. Dixon:
Marine peril—
The Court:
Peril—everything. The ship—the Captain was in command; the crew was in command; and this man offered suggestions . . . ." (Record 1338)
The formal findings elaborate on this underlying factor:

"33. Ample fire fighting forces were at hand on February 17th to handle such fire fighting as was needed. Such fire as remained after the application of $CO_2$ gas could have been extinguished without any participation by the plaintiffs. I find that there was no peril reasonably to be apprehended with respect to the vessel or her cargo such as would entitle the plaintiffs to a salvage award. The evidence show there was a controlled situation on board the OLGA JACOB from the time the fire was reported to her master. The vessel's crew acted promptly and efficiently to extinguish the fire. Thirty or forty firemen with attendant equipment were almost immediately at the scene. All the evidence affirmatively showed that all the witnesses felt these fire personnel were competent."

meritorious service, and in proportion to the nature, duration, risk, and value of the service rendered." 77 U.S. at 12, 19 L.Ed. at 874.[8]

■■ Nor is it decisive whether the actions were sought by the master or the other firefighters or persons superintending the operations. So long as the services are voluntary and are not rejected by those in authority a bystander or interloper is eligible for salvage award in proportion to the value of his contributory efforts.

■ But all of these things bear on the contribution made, if any, and the relative value toward the successful achievement. They do not bear on the element of peril. Yet it was these factors which were evaluated for a wrong purpose by the trial court.

The conclusion of no peril cannot be sustained. Peril was positively established. Fort Myers Shell & Dredging Co. v. The Barge NBC 512, 5 Cir., 1968, 404 F.2d 137.

■ Since it is uncontradicted that Legnos and Gorman did perform some acts which bore directly on the successful efforts to extinguish the fire,[9] they are entitled to have these services properly evaluated in the light of the interests at risk and the contributions of all others whether claiming or eligible to claim a salvage award in their own right.[10] Except that some award is required, we intimate no views as to the amounts thereof.

## TAG ENDS

## WWLP

■ The trial court held that shipowner (and charterer) on their impleaders against the contracting stevedore had failed to prove with requisite certainty that the fire was caused by stevedore's breach of WWLP.[11] The finding is above the 52(a) Plimsoll line and with it falls the prayer for attorneys' fees and expenses despite exoneration (momentary). See Hill v. Flota Mercante Grancolombiana, E.D.La., 1967, 267 F. Supp. 380, aff'd, 5 Cir., 1969, 405 F.2d 878, cert. denied, 395 U.S. 934, 89 S.Ct. 1995, 23 L.Ed.2d 449.

We affirm this holding and judgment.

### Time Charterer

As the district court did not reach the issue of the time charterer's liability for salvage we think this should go back on remand. It may never be necessary to resolve it, either legally or as a practical matter. And if reached the answer might turn on what was at risk from

---

8. See M. Norris, supra, § 91.

"A successful outcome of the salvage operation is necessary . . .. It is not required however that the property be saved solely by the efforts of the person seeking the award . . .. It is sufficient if his efforts contributed in some way to the ultimate success." See also Dize v. Barge Beverley, D.C.Va., 1965, 247 F.Supp. 968, 1965 A.M.C. 1886.

Contribution may be achieved by co-salvage where several sets of salvors render service. M. Norris, supra, § 92.

9. See findings of fact Nos. 8, 20, 21, 23, 25.

With respect to No. 8 we are unable to see how the initial exploratory efforts (see note 1, supra) by going down into lower hold No. 5 and locating the fire was involuntary in the sense of acting under legal compulsion as the contracting stevedore.

10. Thus, on remand the Court, besides fixing values of ship, cargo and freight at risk, must determine the total amount for salvage services performed by all including the two fire fighter groups and the claiming salvors and then make an award to the claiming salvors in proportion to their own contribution. H. Norris, supra §§ 221–231.

The Judge is entitled to use the present record and may supplement it in any way which the parties agree is appropriate or as the Court finds is necessary.

11. Warranty of workmanlike performance, see D/S OVE SKOU v. Hebert, 5 Cir., 1966, 365 F.2d 341 at 345, 1966 A.M.C. 2223 at 2226; Grigsby v. Coastal Marine Service of Texas, Inc., 5 Cir., 1969, 412 F.2d 1011, 1969, A.M.C. 1513, cert. dism'd, Fidelity & Cas. Co. v. Grigsby, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531.

charterer's standpoint, especially in relation to cargo and freight money.[12]

### United States as Cargo Owner

The court likewise found it unnecessary to evaluate the claim that the West German Government not the United States was the owner of the cargo laden at Port Canaveral. As with time charterer's liability we conclude this should go back for disposition on remand.

Reversed and remanded in part. Affirmed in part.

---

12. Salvor's brief points out that:

Norris, The Law of Salvage, § 46, cites the case of Tice Towing Line v. James McWilliams Blue Line (D.C.N.Y.1931), 51 F.2d 243, 246:

"A claim for salvage may be maintained in personam against any party whose relationship to the vessel or thing salved is such that he might have been liable in respect of its damage or loss, . . . or who, though not its owner, is benefited by its being salved. . . ."

They cited:

Other examples of a non-owner's liability for salvage: The Public Bath No. 13, (D.C.N.Y.1894) 61 F. 692 (Ship Repairer); Five Steel Barges, L.R. 15 Prob.Div. 142 (1890) (Vendor with obligation to deliver by a certain date) and The Port Victor, 9 Asp.Mar. Law Cases (New Series) 163 (1901) (Charterer liable for safe delivery of cargo).