**SEA–LAND SERVICE, INC., et al.,
Plaintiffs-Appellants,**

v.

**AETNA INSURANCE COMPANY et al.,
Defendants-Appellees.**

No. 172, Docket 76–7171.

United States Court of Appeals,
Second Circuit.

Argued Oct. 22, 1976.

Decided Nov. 24, 1976.

---

M. E. DeOrchis, New York City (Haight, Gardner, Poor & Havens, Chester D. Hooper, Bruce C. Beringer, New York City, of counsel), for plaintiffs-appellants.

David L. Maloof, New York City (Donovan, Maloof, Walsh & Kennedy, Donald M. Kennedy, New York City, of counsel), for defendants-appellees.

Before FRIENDLY, HAYS and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

Sea-Land Service, Inc. (Sea Land), the charterer of the S.S. Beauregard (Beauregard), and its underwriters appeal from that portion of a judgment of the United States District Court for the Southern District of New York, denying them a general average contribution from the defendant marine insurance carriers which had insured cargo interests. The contribution sought was stipulated to be $478,816 representing bottom damage to the Beauregard incurred during a salvage operation at Rio Haina, Dominican Republic in May 1967. The opinion of the Honorable Whitman Knapp, who conducted a bench trial on July 15, 16 and 17, 1975, was filed on February 10, 1976. A consent judgment in favor of the plaintiffs was entered on May 19, 1976 awarding them the sum of $54,231.17 for certain costs of towing and salvage, plus interest. The only issue before this court is whether or not the trial court properly determined that the substantial bottom damage to the Beauregard was not a general average loss which should be ratably shared by cargo interests.

I

The Beauregard was build in 1943 as a break-bulk cargo carrier and was converted in 1957 into a container carrier. In 1967 she was operated by Sea Land, sailing from New York on April 28, 1967 with cargo in containers bound for Rio Haina, Dominican Republic. While proceeding into the harbor of Rio Haina on May 5, 1967, the Beauregard encountered serious difficulties in approaching the entrance because of adverse weather and sea conditions. Her Master, Captain Boehm, was an experienced mariner who held a Master's license for 23 years. He had been Captain of the vessel for about two years and had previous experience entering Rio Haina. The first approach to the harbor entrance was aborted because of heavy rain squalls and poor visibility. A second approach was attempted after the Dominican Government Harbor Pilot E. Torres had boarded the Beauregard from a small boat. Again the adverse weather

conditions prevented the entry. When the weather appeared to have improved, a third effort was made at 1802 hours. However, freshening winds, and strong currents drove the ship into the rubble of the west breakwater of the harbor at 1813 hours, where she grounded at what the parties have termed Position A (bow pointed 357° True, the bow being about 15 feet from and 20 feet inshore of the west breakwater). The vessel was then six feet onto the rocks on the port side. Captain Boehm ordered full astern in an unsuccessful effort to release the ship through its own power. She remained grounded with the port bow against a wrecked tanker. Pilot Torres blew a danger signal requesting assistance, and a tug was at the scene within ten minutes. The tug was directed to the starboard quarter and a manila hawser was attached to the tug which took up the slack and pulled while the ship's engines were kept full astern at the same time. After ten minutes of pulling, as the vessel was beginning to move but before she left the strand, the towline broke. After the line broke, the vessel was pushed sideways to port by the winds and the waves, sustaining the bottom damage which occasioned this litigation. The ship's bow now rested in Position B (vessel's bow was pointing 015° True, the bow being about 175 feet inshore of the end of the west breakwater.) At 2108 hours, on May 8, 1967, the Beauregard was eventually refloated. She remained underway at sea all night and at daybreak entered Rio Haina harbor with her cargo and crew safe and sound; a happy ending for mariners, but predictably the genesis of an acerbic dispute among underwriters and their counsel. 'Twas ever thus.

## II

■ The concept of general average contribution in maritime law is ancient, dating back to the Romans, surviving we are told the fall of the Roman Empire and recognized from the Middle Ages until the present time by all the principal maritime nations. G. Gilmore and C. Black, The Law of Admiralty 244–45 (2d ed. 1975). The principle is simply stated—when one who partakes in a maritime venture incurs loss for the common benefit, it should be shared ratably by all who participate in the venture. *CIA. Atlantica Pacifica, S.A. v. Humble Oil & Refining Co.,* 274 F.Supp. 884, 891 (D.Md.1967). Modern law and practice relating to the adjustment of general average is determined generally by the York-Antwerp Rules, 1950. The complaint in this action alleges in Par. 8 that the bills of lading issued for the cargo carried on board the Beauregard provide that "General Average shall be adjusted, stated and settled according to the York-Antwerp Rules, 1950 . . . .." *

■ Rule A of these Rules defines a general average act as "any extraordinary sacrifice or expenditure [which] is intentionally and reasonably made or incurred for the common safety for the purpose of preserving from peril the property involved in a common maritime adventure." There is no dispute here that the effort of the Master of the Beauregard to free the vessel from the strand by the use of the tow was an act of general average. The costs of the tow have already been determined and stipulated on that basis. The vessel, the crew and the cargo were in imminent peril, and the Captain acted promptly and reasonably for the common good. No negligence on the part of either the Master or the Pilot caused the stranding.

However, it does not follow that the damage to the bottom of the Beauregard is recoverable as general average. Rule C of the York-Antwerp Rules, 1950 provides:

---

* The York-Antwerp Rules were adopted by a Conference of the Association for the Reform and Codification of the Law of Nations held at Liverpool in 1890 and were amended and supplemented in 1924, 1950 and 1974. While not having the force of law, their inclusion by reference in bills of lading, as here, makes them contractually binding on the parties. *St. Paul Fire & Marine Ins. Co. v. The Motomar,* 211 F.2d 690, 692 (2d Cir. 1954); *CIA. Atlantica Pacifica, S.A. v. Humble Oil & Refining Co., supra,* 274 F.Supp. at 891; G. Gilmore and C. Black, *supra* at 252–53.

"Only such losses, damages or expenses which are the *direct consequence* of the general average act shall be allowed as general average. . . ." (emphasis supplied). Moreover, Rule E provides: "The onus of proof is upon the party claiming in general average to show that the loss or expense claimed is properly allowable as general average." There was, however, no finding of fact that the damage incurred by the shift of the vessel from Position A to B was caused by the act of sacrifice, the towing. The only record reference made by the appellants (Rec. at 405) is to a colloquy between Judge Knapp and counsel at the end of the trial where Judge Knapp stated: "Again, I don't know what I will conclude after reading the deposition which isn't the basis of what I heard on cross examination of various witnesses and what the gentlemen might have said about it in different parts of the trial, but it is my guess that I will conclude that the pulling off materially increased the possibility of the shift from A to B." The point is that Judge Knapp actually made no such finding. On the contrary, he found:

8. It is more likely than not that the ship would have shifted roughly to "position B", regardless of whether the tow had been attempted. This finding is based on the evidence of wind and current and the testimony of eyewitnesses.

9. In light of finding 8, had the tow not been attempted at least the damage actually suffered would have occurred.

In an effort to establish that the aborted towing did contribute to the sideward movement of the vessel after the towline break, appellants argue that the Beauregard's bow was firmly embedded when she first ran aground, and that the tow had moved her out far enough to permit the bow to pivot and the stern to swing to port. While plaintiffs' proposed finding of fact No. 10 was "The vessel did not move or break free until the tug started to pull, when her bow was felt coming free," this finding was rejected by the court below. It is conceded moreover that after the towline broke, the Beauregard was still stranded. While there was testimony that the vessel

had begun to move, there is no evidence that the vessel was in substantially any different position than when she originally grounded. Sea Land argues that the Beauregard could not have swung to port from Position A as she did until the tow had moved her out far enough to clear the wrecked tanker. We are referred to maps and photographs in support of this contention. There is no doubt but that the vessel was stranded with the wrecked tanker on her port bow. The court below so found. However, the court's finding that it was more probable that the vessel would have moved from Position A to B by the wind and current was based upon the eyewitness testimony of experienced mariners, Captain Boehm, Pilot Torres and the tug Captain Rojo, all of whom testified that the ship would have been so moved by the wind and the heavy seas. There is no eyewitness testimony that the towing operation had in any way caused the move from Position A to B. In fact, in Finding of Fact No. 12, which is not challenged on appeal, the court found: "The master's action in attempting the tow in no way increased the danger to the ship." We conclude that the plaintiffs did not shoulder the burden of proof of establishing that the towing so moved the vessel that she became more vulnerable to natural forces, thereby rendering the bottom damage general average.

■ Nor can we characterize Findings 8 and 9 as clearly erroneous. They were based upon the eyewitness testimony of three experienced mariners, two of whom were regularly employed in the harbor where the accident occurred. The only contrary testimony is that of Mr. Edward Ganly who was retained by Sea Land to make a survey of the Beauregard when the vessel returned to drydock in Hoboken, New Jersey. His trial testimony was, in effect, that the bow of the vessel was so firmly imbedded in the rubble of the breakwater that it would not have been possible for the lateral move to take place unless the tow had dislodged the vessel. The court obviously discredited that testimony and was impressed with the eyewitness testimony of the three mariners who were present and

participated in the events we have related. Ganly also testified that the ship was six feet onto the rocks, thus leaving 462 feet (the vessel was 468 feet 8½ inches in length) free and a target for the wind and waves. The Coast Guard Report which was admitted in evidence indicates that at the time the wind was from the East at 15 to 25 knots with four-foot waves and 10 to 15-foot swells from the East North East. Judge Knapp's challenged findings appear to be reasonable in light of this evidence.

Appellants warn us that an affirmance here will encourage refusals to share in general average losses and will open a new line of litigation in an area where general average adjusters' opinions have been dispositive in the past. It is true that Mr. Howard Myerson, the general average adjuster here employed, classified the bottom damage as general average. However, his testimony indicates that this was based on Mr. Ganly's opinion that the vessel was so firmly fixed by the bow that had the tow not been attempted, she would not have suffered further damage. It further appears that Mr. Myerson's conclusions would probably have been different had the facts been as found by the court. Judge Knapp, in questioning Myerson, commented:

> The Court: I understand your position that if the towing operation substantially increased the probability of it going over that is general average?
>
> The Witness: Yes.
>
> The Court: If it didn't substantially increase the probability of it going over it is not general average?
>
> The Witness: Yes.

### III

In an effort to avoid the "clearly erroneous" rule, appellants urge that the court below applied an erroneous test in determining general average. We are told that we need not decide that the towage attempt caused the sideward movement to define it as general average. "The Court only needs to determine that the sideward movement was avoidable when the vessel first ran aground and that the method of

salvage chosen by the Master, the General Average sacrifice, allowed it to occur." We agree that the Master did or should have anticipated that the towline might part. We further agree that if the breaking of the towline permitted a sideward movement that would not otherwise have occurred, the damage would be general average and cases such as *Australian Coastal Shipping Commission v. Green,* [1971] 1 Ll. Rep. 16 (C.A.1970) and *Anglo-Grecian Steam Trading Co. v. T. Beynon & Co.,* [1926] 25 Ll.L.Rep. 122 (K.B.1926) would be in point. In both cases the act of towing caused the damage. In *Green,* which involved two incidents of towing by tugs where the snapping of the towlines caused them to become ensnarled in the propellers of the tugs, the resulting damage to the tugs was properly found to be the direct consequence of the sacrifice. The subsequent accident, the parting of the towline, did not break the chain of causation. In *Beynon,* the vessel was in peril and was taken in tow. The intention was to beach the vessel in the center of a bay. On the way she grounded, the towlines parted and the ship was damaged on the rocks. Again, it was held to be general average damage directly caused by the act of sacrifice. However, the applicability of these cases here depends upon Sea Land's ability to establish that the tow had permitted the vessel to be pulled free enough to permit a sideward motion which otherwise would not have occurred. In sum, Sea Land cannot escape the issue of fact which, as we have already indicated, it has failed to do.

Appellants argue that the Master could have held the vessel fast in her initial position with the use of her engines alone. This is based on no testimony of eyewitnesses but again the testimony of Mr. Ganly which the court below obviously discredited. Finding of Fact No. 10 was:

> It was not open to the master to attempt to hold the ship in "position A" by using "full ahead" power and thus driving her further on the rocks.

Appellants urge that this finding was clearly erroneous and represents an improp-

er judicial "second guessing" of the Master of the Beauregard. The argument is curious. The court did not second guess the Captain. It found that his action in seeking the tow to refloat the vessel was not negligent. It found she "could have been holed and broken where she was" (Plaintiff's Proposed Finding No. 6, accepted below) and that "The master's action in attempting to tow in no way increased the danger to the ship." (Finding No. 12). By raising the argument on appeal that in fact the Beauregard could have been held in Position A, thus avoiding the damage incurred by the move to Position B, it is the appellants rather than the court who are in fact second guessing the Captain. If pressed to its ultimate conclusion, it might be argued that Boehm did not act reasonably and therefore no general average act occurred. Appellants naturally do not go this far. They are raising the point to establish that the act of towing was responsible for the lateral movement of the vessel. We repeat, there was no such proof. In any event, the only testimony that the vessel could have held her position by going ahead with a left rudder was Mr. Ganly's who was not present. Captain Boehm testified that he could not hold the vessel in Position A by using an anchor and tugs. Moreover, there is no proof as to how long her engines could operate because of the sand and water which were being sucked in due to the stranding. The court below had the opportunity to observe Mr. Ganly as he testified, and we cannot characterize its finding which rejected that testimony as clearly erroneous.

Appellants urge that an affirmance here will promote appeals from general average adjustments and will discourage Masters from saving cargo. We believe, on the contrary, that this case represents no departure at all from general average principles, and that appellants have simply failed to sustain their burden of proof of direct damage as a result of the general average sacrifice as required by York-Antwerp Rules, 1950. We state emphatically that we have no ambition to encourage general average litigation. Here, the expert adjuster, a self-styled "desk man", accepted the version of the facts received from a naval architect who examined the Beauregard in Hoboken, New Jersey several weeks after the incident and whose opinion was ultimately rejected by the court below. There was no difference between the court and the adjuster as to the principles to be applied. We do not consider it realistic to assume that Masters of ships facing imminent peril on the high seas will base their professional maritime decisions upon what allocation of general or particular average an adjuster might make and what a trial or appellate court might thereafter decide. The time it would take to make such calculations could only result in the proliferation of maritime disasters. Decisions such as those made here will hopefully continue to be made by experienced and skilled mariners for the common good of the vessel, the cargo and the crew.

FRIENDLY, Circuit Judge (dissenting):

My disagreement with the majority is narrow. As I read my brother Mulligan's opinion, he does not dispute that if the vessel had sustained her burden of proving that the towing operation, with its hazard of a broken tow line, significantly enhanced the risk that the Beauregard would drift to port and scrape her bottom, the damage would have been a "direct consequence" of the general average act under Rule C of the York-Antwerp Rules. *Cf.* Restatement (Second) of Torts § 442B, Comment b at 470 (1965), *see also id.* § 432. The majority considers, however, that the district court found, and properly could find, that the maneuver did not significantly enhance the risk of what in fact occurred. I do not read the findings that way.

The briefs and argument before us focused on findings 8 and 9; appellees would read more into them than they say. Finding 8 says only that there was a 50.1% chance that the Beauregard "would have shifted roughly to 'position B', regardless of whether the tow had been attempted." If the tow increased this risk to say 75%, the tow would have been a significant factor in

enhancing the risk, yet the maneuver would still have been prudent in light of the plaintiffs' proposed finding of fact 6, incorporated by the court as its finding 13:

> While the vessel was in her first position immediately after the stranding with her bow embedded in the breakwater, she was subject to obvious perils. She could have been holed and broken where she was, as had another vessel previously, and all might have been lost.

Finding 9 has the same elusive quality of seeming to say more than it really does. All that it actually says is that if the tow had not been attempted, the vessel would *either* have drifted as she did *or* suffered something much worse; it does not deny that the towing significantly enhanced the risk of a movement to port if the maneuver freed the ship from the rocks but the tow line then broke. The majority endeavor to supply this omission by reference to finding 12:

> The master's action in attempting the tow in no way increased the danger to the ship.

However, this comes in a portion of the findings devoted to showing that the master acted prudently, following immediately finding 11:

> The master used good seaman's judgment in attempting the tow.

and appellees did not contend that finding 12 had any relevance to the issue before us. Moreover, finding 12 also does not say what the majority evidently think it does; it is quite consistent with the view that even though the tow significantly increased the risk of a shift to port if the line should break after the vessel were partially freed, the total danger to the ship, including many dangers of quite different sorts, would be no greater than if the master did not attempt it. On the other hand, the majority are right in saying that the district court did not find that the tow "materially increased the possibility of the shift from A to B." We are thus in a position where we have no finding, either way, on the critical issue.

In such a situation we could either remand for a further finding or make our own. Of course, there would be no point in remanding if the evidence compelled a finding that the tow was not a significant factor in the shift to port. I do not read the evidence as doing this. To begin, there was unanimity among the eyewitnesses who testified on the subject that the towing operation had moved the Beauregard aft and at least partly off the rocks. (Boehm, 340a–341a; Torres, 427a, 429a; Calderon, 447a). It would seem inescapable, as a matter of common sense, that this enhanced the risk of the Beauregard's drifting to port if the line broke, as against a lesser possibility of drift and a greater possibility of more serious harm if she did nothing. Similarly I do not find the eyewitness testimony cited to us by appellees to be as impressive as my brothers do. When asked

> Right, if nothing were done, she would have come right around to where she did end up?

Captain Boehm, while saying "Yes, that's true," added "Maybe worse. I didn't know what was in there." (401a). I think the captain was simply defending his conduct against appellees' attack, not negating that the towage if only partially successful would enhance the risk of a slippage to port. This is particularly clear in light of his immediately preceding answer:

> But we couldn't sit there, let the ship drift further inshore. We had to do something. The stern would have swung right around. (401a).

and the immediately following question and answer:

> Q. You knew there was a tanker there and that was danger?
>
> A. Yes, but while she was swinging around, what was in there—suppose she swung around and capsized?

Similarly the passage from Pilot Torres' testimony cited by appellees is not a declaration that but for the towage, the ship would inevitably have ended up in Position B; he said only that the ship would "go to the west" and "hit against the rocks" (443a, 417a)—possibly incurring much larger dam-

age to herself and to cargo. The third eyewitness, Sea Land's port manager Collie, simply mentioned vaguely in a report that it was urgent to float the Beauregard "before she further beached herself" (E–100); this could mean many things besides a shift to Position B. Perhaps the most favorable statement for appellees was in the deposition of Mello, Sea Land's marine manager for the Caribbean area, not an eyewitness, that the cause of the change in position was "most likely wind and weather" and that the partial removal from the strand could not have caused the shift because the vessel was still aground on the bow "two hours after the line parted." (292a). However, Mello's testimony at trial was considerably less favorable to appellees (136a–137a), and even his earlier opinion is not inconsistent with a conclusion that but for the movement effected by the tow, the risk of the Beauregard's shifting from Position A to Position B would have been substantially less.

In my view the difficulty here has arisen because of the district court's shift from the standard it enunciated at the end of the trial, namely, whether the towing "materially increased the possibility of the shift from A to B" to the concept, implicit in finding 8, that general average would not lie if it was "more likely than not that the ship would have shifted roughly to 'Position B', regardless of whether the tow had been attempted." Since we all agree that the former is the correct standard, I would reverse and remand for explicit findings in regard to it.