AMERICAN AFRICAN EXPORT CO., INC., Akron Fashions, Inc., Wong Lin Corp. of America, S.S.C. International, Inc., Okuda Company, New York, Inc., Biddle Purchasing Company and Mitsubishi International Corporation, Plaintiffs,

v.

S.S. EXPORT CHAMPION, her engines, boilers, etc., and American Export Lines, Inc., Defendants.

No. 74 Civ. 4065 (JMC).

United States District Court, S. D. New York.

Nov. 30, 1977.

Donovan, Donovan, Maloof & Kennedy by Donald M. Kennedy, New York City, for plaintiffs.

Haight, Gardner, Poor & Havens by Brian D. Starer, New York City, for defendants.

## OPINION

CANNELLA, District Judge:

After a bench trial, plaintiffs are entitled to compensation from defendants in general average for the damage done to their cargo in extinguishing shipboard fires on the vessel Export Champion.

The case is within the admiralty and maritime jurisdiction of this Court. 28 U.S.C. § 1333.

The liability issues were tried to the Court on July 22–23, 1976. At the conclusion of the testimony, the Court adjourned the case so that defendant could either produce the ship's Captain or take his deposition. The deposition was taken on September 2, 1976 and filed with the Court on October 7, 1976. Shortly thereafter both sides rested. The following are the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

## FACTS

Plaintiffs were the owners of certain cargo shipped from the Far East on board the defendant vessel Export Champion. This cargo was stowed in the forward end of No. 2 orlop deck[1] when the ship departed the Port of Inchon, Korea on the morning of September 9, 1973.

Approximately eight minutes out to sea, at 8:52 a. m., the Chief Mate noticed light smoke coming from the No. 2 hatch exhaust fans and immediately reported to the Captain. The Captain sounded the fire alarm, ordered the Chief Mate to secure all ventilation to hatch No. 2 and to close the exhaust vents from the hatch, and ordered the engine room to supply water pressure to the deck. The crew assembled on the deck and brought hoses to the No. 2 hatch. The hatch cover was opened at 8:55 a. m., but,

due to heavy noxious smoke, the crew was unable to direct water onto the fire. Consequently, at 9:06 a. m. the hatch cover was closed, outside ventilation was secured, and the crew inserted rags between the hatch cover and hatch opening in order to form a seal. At 9:13 a. m. twelve 100-pound bottles of carbon dioxide were discharged into the No. 2 lower hold and orlop deck.[2] At 9:30 a. m. four additional bottles of carbon dioxide were discharged into the No. 2 orlop deck and lower hold.

During the time the firefighting efforts were proceeding on deck, the Captain remained on the bridge, reduced the vessel's speed and maneuvered the ship into anchorage clear of all traffic lanes. At 9:40 a. m. the S.S. Export Champion anchored approximately five miles from P'almi Do Island. At 9:55 a. m. two additional bottles of carbon dioxide were discharged into the No. 2 orlop deck. Another two bottles were discharged at 10:25 a. m.

After the ship anchored, the Chief Mate went to the bridge to discuss the situation with the Captain. They examined the cargo plan and boat notes to determine what cargo was stowed in the area of the No. 2 orlop deck. The 120 tons of cargo stowed in this area consisted of canned goods, plastic sandals with rubber soles, and rubber shower slippers. The Captain concluded there was no immediate danger since the fire in the No. 2 hold was apparently contained and under control. He determined that the ship should continue to her next scheduled port, Pusan, Korea. As the ship sailed, the Captain sent the following cable to defendant shipowners, American Export Lines:

PUSAN SMALL FIRE TWO LOWER HOLD DEPARTING INCHON EXTINGUISHED WITH CO$_2$ ARRANGING SURVEY PUSAN.

During the 24-hour run from Inchon to Pusan, crew members periodically checked the sealed No. 2 hatch and noticed no smoke escaping. They tested the bulkhead in the No. 3 lower hold immediately adjacent to

---

1. The orlop deck is the first deck up from the lowest deck in No. 2 hold.

2. The S.S. Export Champion was equipped with an electronic smoke detection system and a carbon dioxide fire extinguishing system.

the No. 2 orlop deck and found it remained cool. Immediately forward of the No. 2 orlop deck, in the No. 1 lower hold, were ballast tanks filled with salt water. The bulkhead in. the No. 1 lower 'tween deck, above and forward of the No. 2 orlop deck, was found to be very warm. At 2:00 p. m., and again at 7:00 p. m., four more bottles of carbon dioxide were injected into the No. 2 orlop deck and lower hold.

The S.S. Export Champion arrived and docked at Pusan, Korea at approximately 11:00 a. m. on September 10, 1973.

At the request of the Captain, a cargo surveyor came on board at approximately 1:00 p. m. With the crew standing by on deck with three hoses, the No. 2 hatch was opened. The Chief Mate and a junior officer donned oxygen breathing apparatus and turned on the ventilation to the No. 2 hatch to clear out the carbon dioxide and smoke that had· been sealed inside the hatch. They entered the No. 2 hatch proceeding from the ship's deck to the upper 'tween deck, and thence to the lower 'tween deck, immediately above the orlop deck. In attempting to open the lower 'tween deck hatch covers, a hydraulic line ruptured, spraying oil over the hatch and allowing only a partial opening of the lower 'tween deck hatch covers. Upon exposure to air, the fire in the No. 2 orlop deck cargo regenerated. The crew sprayed the fire with two hoses from the ship's deck; a third hose was passed down to the Chief Mate to spray the fire from his position on the lower 'tween deck. In twenty minutes these efforts successfully extinguished the fire.

The cargo in the No. 2 orlop deck was allowed to cool and a cleaning gang was sent into the hold to sort and segregate the fire-damaged and water-soaked cargo. The cargo was periodically wetted down during the course of the sorting operation to make sure the fire was out. The cargo surveyor's report listed cargo that was neither touched by fire nor charred by smoke, but was damaged by the extinguishing sea water.

In this trial on the issues of liability only, the parties have stipulated:

Plaintiffs' cargo was damaged as the result of efforts used to extinguish the fire and/or as a result of the fire itself, but the extent thereof is to be an issue in a damage trial.

## GENERAL AVERAGE

The question before the Court·is whether the damage to plaintiffs' cargo, caused by the means used to extinguish the fire,[3] was a general average loss which should have been shared ratably by the vessel and· by surviving cargo and freight interests.

Some trace the origin of general average law to a single sentence from the Rhodian Maritime Law, 900 B.C.:

If for the sake of lightening a ship, a jettison of goods has been made, what has been given for all shall be made up by the contribution of all.

The sentence appears under the heading "Of the Rhodian Law of jettison" in Justinian's Digests, A.D. 533. See 1 Benedict on Admiralty § 3, at 1–7 to 1–14 (7th rev.ed. 1974). Greek or Roman, a recent statement of the Second Circuit demonstrates that general average law remains unchanged to the present day.

. . . [W]hen one who partakes in a maritime venture incurs loss for the common benefit, it should be shared ratably by all who participate in the venture.

Sea-Land Service, Inc. v. Aetna Insurance Co., 545 F.2d 1313, 1315 (2d Cir. 1976).

In Columbian Insurance Co. v. Ashby, 38 U.S. (13 Pet.) 331, 338, 10 L.Ed. 186 (1839), the first general average case in the Supreme Court, Mr. Justice Story, speaking for the Court, formulated the elements as follows:

First, that the ship and cargo should be placed in a common imminent peril; secondly, that there should be a voluntary sacrifice of property to avert that peril; and, thirdly, that by that sacrifice the safety of the other property should be

---

**3.** The Fire Statute, 46 U.S.C. § 182, and the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(2)(b), preclude plaintiffs from recovery for the cargo damaged by the fire itself.

presently and successfully attained. Hence, if there was no imminent danger or necessity for the sacrifice . . . no contribution was due.

*Accord, Ralli v. Troop*, 157 U.S. 386, 394, 15 S.Ct. 657, 39 L.Ed. 742 (1895); *Barnard v. Adams*, 51 U.S. (10 How.) 270, 303, 13 L.Ed. 417 (1850).

### The York-Antwerp Rules

■ In the instant case, the parties are contractually bound to adjustment of general average claims according to the York-Antwerp Rules, 1950, which were incorporated by reference into defendants' bills of lading.[4]

The post-trial briefs in this case focus on a question involving the interplay of the following rules:

### RULE OF INTERPRETATION

In the adjustment of general average the following lettered and numbered Rules shall apply to the exclusion of any Law and Practice inconsistent therewith.

Except as provided by the Numbered Rules, general average shall be adjusted according to the lettered Rules.

#### Lettered Rules

Rule A.

There is a general average act when, and only when, any extraordinary sacrifice or expenditure is intentionally and reasonably made or incurred for the common safety for the purpose of preserving from peril the property involved in a common maritime adventure.

#### Numbered Rules

### Rule III—*Extinguishing Fire on Shipboard*

Damage done to a ship and cargo, or either of them, by water or otherwise, including damage by beaching or scuttling a burning ship, in extinguishing a fire on board the ship, shall be made good as general average; except that no compensation shall be made for damage to such portions of the ship and bulk cargo, or to such separate packages of cargo, as have been on fire.

*York-Antwerp Rules*, 1950, *reprinted in* 6 *Benedict on Admiralty* 346–48 (7th rev. ed. A. Knauth & C. Knauth 1969).

### Is Peril Necessary?

Plaintiffs contend that the effect of the Rule of Interpretation is to make the numbered Rules paramount to the lettered Rules. "Thus if the facts support a claim in general average under the numbered Rules, it matters not that there has been no general average act within the meaning of Rule A." *Lowndes & Rudolf, supra* n. 4, ¶ 548, at 256–57. Plaintiffs argue that, since the facts of the instant case are squarely within Rule III, they are relieved of the burden of proving[5] the elements of a general average act as set forth in Rule A. Specifically, plaintiffs claim they need not prove that the ship and cargo were in peril, as is required by Rule A and by commonly accepted principles of general average law, *see, e. g., Columbian Ins. Co., supra*, 38 U.S. (13 Pet.) at 338; *Lowndes & Rudolf, supra* n. 4, ¶ 31, at 15.

Defendants, citing *Lowndes & Rudolf, supra* n. 4, ¶ 549, at 257, argue that Rule III is

---

4. The text of the York-Antwerp Rules, 1950, may be found at 6 *Benedict on Admiralty* 346–55 (7th rev. ed. A. Knauth & C. Knauth 1969).

The York-Antwerp Rules were adopted by a Conference of the Association for the Reform and Codification of the Law of Nations held at Liverpool in 1890 and were amended and supplemented in 1924, 1950 and 1974. While not having the force of law, their inclusion by reference in bills of lading, as here, makes them contractually binding on the parties.

*Sea-Land, supra*, 545 F.2d at 1315 n.*; *see generally* R. Lowndes & G. Rudolf, *The Law of*

General Average & the York-Antwerp Rules (10th ed. J. Donaldson, C. Staughton & D. Wilson 1975) (7 British Shipping Laws) [hereinafter cited as "Lowndes & Rudolf"].

5. Rule E of the York-Antwerp Rules, 1950, states that

[t]he onus of proof is upon the party claiming in general average to show that the loss or expense claimed is properly allowable as general average.

*Reprinted in* 6 *Benedict on Admiralty* 347 (7th rev. ed. A. Knauth & C. Knauth 1969).

to be read in the context of Rule A except where the two Rules are found to be inconsistent as applied to a particular case. Defendants submit that Rule III is silent on the need to establish peril because Rule A consistently incorporates this requirement into Rule III.

In support of plaintiffs' position—that a specific finding of peril is unnecessary—one could argue that Rule III embodies a conclusive presumption that every hostile fire aboard ship is a peril, cf., *Legnos v. M/V Olga Jacob*, 498 F.2d 666, 670 (5th Cir. 1974); L. Buglass, *Marine Insurance & General Average in the United States* 146 (1973) [hereinafter cited as "Buglass"]; or, that by incorporating the York-Antwerp Rules, 1950, into the contract of carriage, the parties have agreed that losses described by the numbered Rules are to be treated *as though* they resulted from a general average act;[6] or, that the Rule of Interpretation clearly establishes the supremacy of the numbered Rules, see Lord Chorley & O. Giles, *Shipping Law* 198 (6th ed. 1970).

 On the other side of the coin, the law of general average has required a finding of peril at least since the time of the Roman Empire. *See Lowndes & Rudolf, supra* n. 4, ¶¶ 1–4, at 3–6. Mr. Justice Story placed "peril" first among the elements of general average. *Columbian Ins. Co., supra*, 38 U.S. (13 Pet.) at 338. Professors Gilmore and Black, in discussing Rule III, state that peril "is an essential ingredient of general average." G. Gilmore & C. Black, *The Law of Admiralty* § 5–8, at 234 (1957). Additionally, the York-Antwerp Rules, although contractually binding on the parties, do not have the force of law. *Sea-Land, supra* n. 4. Therefore, the Court joins the Fifth Circuit in declaring that the numbered Rules do not eliminate "the requirement that the ship be in a position of peril before the law of general average applies." *Orient Mid-East Lines, Inc. v. A Shipment of Rice,* 496 F.2d 1032, 1039 (5th Cir. 1974), *cert. denied,* 420 U.S. 1005, 95 S.Ct. 1447, 43 L.Ed.2d 763 (1975).

### Was the Ship in Peril?

Defendants argue that the size and location of the fire; the nature, type and stowage of the cargo; the conditions of the immediate surrounding space; the recent construction of the ship; the existence of waterproof hatch covers, carbon dioxide firefighting systems and fire hose equipment; and the competent and well-trained performance by the crew support the Captain's determination that the ship and cargo were never in peril.[7] The testimony of the ship's Captain illustrates defendants' argument.[8]

 Damage done to cargo in extinguishing a fire aboard ship is a traditional

---

**6.** *See Buglass, supra* at 119, where the author, an average adjustor, takes the position that "[t]he numbered rules consist largely of examples of or exceptions to the principles contained in the lettered rules. The exceptions are deemed to be general average by agreement."

**7.** This position was supported at trial by the testimony of the Chief Mate, by defendants' expert witness, and by the person in defendant American Export's New York office charged with recommending whether general average would be declared.

That the Captain chose to sail to Pusan (24 hours) rather than return to Inchon (15 minutes) strongly suggests that he determined the firefighting efforts had eliminated the danger. *See* Trial Transcript at 169.

**8.** In response to the question whether the regeneration of the fire at Pusan constituted a peril to vessel and cargo, the Captain answered:

A. Absolutely not.
Q. Why not?
A. The hatch was wide open. The vessel was alongside of the dock. We could have gotten any amount of help we wanted. We had hoses ready to extinguish any fire available. The fire in that compartment was completely surrounded by steel. It had no way to go.
Q. It could have gone down below to the # 2 lower hold?
A. It could have. We were right there.
Q. You could have prevented it though?
A. Yes.
Q. So you considered there was no peril because you had the means at hand to quickly control the fire, isn't that a fair statement?
A. Absolutely.

Deposition of Captain Lewis M. Hiller, at 66 (Sept. 2, 1976).

general average loss.[9] Defendants miss the point when they argue that the ship and cargo were never in peril because their efforts neutralized the danger. It is conceded that the efforts of the crew preserved the safety of other property in the venture. What is disputed is whether there was a real and substantial danger to ship and cargo *before* the crew acted.[10]

Judge Augustus Hand discussed the nature of peril in general average law in terms of justification for the sacrifice:

> There must be fair reason to regard a vessel in peril in order to require a contribution in general average. While the courts in some cases have used expressions indicating that both in general average and in salvage cases it is essential that the property at risk be subject to an immediately impending danger, we think the "imminency" of the peril is not the critical test. If the danger be real and substantial, a sacrifice or expenditure made in good faith for the common interest is justified, even though the advent of any catastrophe may be distant or indeed unlikely.

*Navigazione Generale Italiana v. Spencer Kellog & Sons, Inc.,* 92 F.2d 41, 43 (2d Cir.), *cert. denied,* 302 U.S. 751, 58 S.Ct. 271, 82 L.Ed. 580 (1937).

In this regard, plaintiffs' expert witness testified at trial that ship and cargo were in peril on September 9 and 10, 1973 and that, if the crew had not taken steps to control the fire, the ship and cargo would have been destroyed. Trial Transcript at 11–14. Moreover, the claims supervisor for defendant shipowners American Export Lines, responsible for recommending whether general average is to be declared, testified at his deposition that, had the crew done nothing, the ship would have sunk. Trial Transcript at 77–78, 109. At the trial, he testified that there was no danger because the sealing of the hatch and the carbon dioxide would have caused the fire to go out, but he refused to "speculate" on what might have happened had nothing been done to control the fire. Trial Transcript at 78–82.

The Chief Mate testified that the crew maintained a fire watch during the cruise from Inchon to Pusan; that approximately one-half of the ship's supply of carbon dioxide had been used in the efforts to contain the fire; and that, in his opinion, were the ship scheduled to cross the Pacific rather than to make the one day sail to Pusan, he would have put into a port and opened the hatch completely. He concluded that the ship was not in peril, but he defined this term to mean "imminent danger," "something explosive or the ship is sinking." In the same breath he admitted that, if he had it to do over again, he still would have undertaken efforts to put out the fire. Trial Transcript at 187–91, 212–15.

Courts and commentators have consistently characterized shipboard fires as perilous. For example, the Fifth Circuit has declared:

> But the question as respects general average is not what was the extent of the danger, supposing this sacrifice to have been made; but what was the danger if this sacrifice should not be made?
>
> 33 F. at 62.
>
> Indeed, the cargo owners are entitled to contribution in general average *only if* the purpose of the act that caused damage to their cargo was to preserve from peril other property involved in the common venture. *See Ralli, supra,* 157 U.S. at 408, 15 S.Ct. 657; *Columbian Ins. Co., supra,* 38 U.S. (13 Pet.) at 338; *Navigazione Generale Italiana v. Spencer Kellog & Sons, Inc.,* 92 F.2d 41, 43 (2d Cir.), *cert. denied,* 302 U.S. 751, 58 S.Ct. 271, 82 L.Ed. 580 (1937); *York-Antwerp Rules,* 1950, *supra* n. 4, Rule A.

---

**9.** *See, e. g., Ralli v. Troop,* 157 U.S. 386, 15 S.Ct. 657, 39 L.Ed. 742 (1895):

> In this country, when a ship is on fire, damage caused to goods in the hold by water, either poured down from above, or let in by scuttling the ship, by the master, or under his order and direction, for the purpose of saving ship and cargo, has long been considered a subject of general average.

157 U.S. at 411, 15 S.Ct. at 667; *Starlight Trading, Inc. v. S.S. San Francisco Maru,* 1974 A.M.C. 1523, 1526 (S.D.N.Y.); *Buglass, supra* at 146–50; *Lowndes & Rudolf, supra* n. 4, ¶¶ 129, 137, at 71, 75; G. Robinson, *Handbook of Admiralty Law in the United States* 768–70 (1939); *York-Antwerp Rules,* 1950, *supra* n. 4, Rule III.

**10.** *See Heye v. North German Lloyd,* 33 F. 60 (S.D.N.Y.1887), *aff'd,* 36 F. 705 (2d Cir. 1888):

A non-friendly fire aboard ship so long as it remains unextinguished is a classic case of marine peril. With flammable materials almost everywhere, passages and spaces where natural convection readily permits a small smoldering to break out in a blazing fury, the history of the sea attests to fire as a cause of the most catastrophic of marine disasters. *Legnos v. M/V Olga Jacob*, 498 F.2d 666, 670 (5th Cir. 1974) (footnote omitted); *see, e. g., Ralli v. Troop*, 157 U.S. 386, 411, 15 S.Ct. 657, 39 L.Ed. 742 (1895); *Starlight Trading, Inc. v. S.S. San Francisco Maru*, 1974 A.M.C. 1523 (S.D.N.Y.); *The Beatrice*, 36 F.2d 99, 101 (S.D.N.Y.1924); *Buglass, supra* at 146; *Lowndes & Rudolf, supra* n. 4, ¶¶ 136–37, at 74–75; M. Norris, *The Law of Salvage* § 64, at 101 (1958); *cf. Sunkist Growers, Inc. v. Adelaide Shipping Lines, Ltd.*, 1976 A.M.C. 2597 (N.D.Cal.).

■ The Court recognizes that, in deciding whether a general average should have been declared, the Captain's "determination faithfully and reasonably made [is] not to be overruled by . . . the court long afterward." *Ralli, supra,* 157 U.S. at 418,

15 S.Ct. at 669.[11] In this case, however, the Captain unreasonably concluded there was no danger only *after* he had employed all the means at his disposal to extinguish the fire. The fair preponderance of the credible evidence supports the conclusion that the fire would have spread if nothing had been done.[12] The sealing of the hatch,[13] the use of carbon dioxide and the hoses at Pusan, and the firefighting efforts of the crew may have eliminated the danger, but these efforts themselves prove the existence of peril. *See Legnos, supra,* 498 F.2d at 671.

■ For the foregoing reasons, the Court holds that the fire on board the vessel Export Champion on September 9, 1973 and the regeneration of the fire on September 10, 1973 presented the real and substantial danger that these fires would spread to other cargo or to the ship itself. Peril was conclusively established. The cargo, untouched by fire, which was damaged by the successful efforts to extinguish the fires, was sacrificed to the common interest in order that the peril be eliminated. The acts of sealing the No. 2 hatch, inserting carbon

11. The Captain's expertise and presence on the scene put him in the best position to evaluate the danger to ship and cargo. Therefore, the law allows him broad discretion and courts have had little trouble in rejecting arguments, illuminated by hindsight, that question the propriety of the Captain's conduct. As Judge Hough noted in *Wilcox, Peck & Hughes v. American Smelting & Refining Co.*, 210 F. 89, 91 (S.D.N.Y.1913):

> If he finds danger in a land-locked harbor, in shallows, at anchor, or moored to a wharf, it should be no answer to register a landsman's opinion as to the necessary absence of danger at such a place.

See *Bowring v. Thebaud,* 42 F. 794, 797 (S.D. N.Y.1890), aff'd, 56 F. 520 (2d Cir. 1892).

In the instant case, the Court has no quarrel with the Captain's direction of the firefighting operation. Indeed, as the cargo surveyor concluded, his conduct was commendable:

> Capt. Hiller's quick decision on the method of extinguishing actions to be undertaken and his able and efficient direction of the same contributed to safe and satisfactory extinguishing [of] the fire.

Captain Hiller's only error was in failing to appreciate that the danger he had eliminated fell within the *legal* definition of "peril" and that, therefore, he should have declared a general average.

12. Defendants' own expert witness testified as follows:

> Q. You think eventually if nothing had been done, that the fire would have extinguished itself?
> A. There is a good possibility that's exactly the result. The only way you could prove that is to take this same vessel and set it on fire—sometimes the Coast Guard conducts drills like that—and that is the only way you could prove that one way or another.
> I would be willing to wager on it that there is a good chance that the fire would have extended to hold 2 or hold 3.

Trial Transcript at 236–37.

13. Judge Knapp came to the same conclusion in *Starlight Trading, supra,* 1974 A.M.C. at 1526:

> The essence of my finding is that it was the sealing of the hatches in order to fight the fire that caused plaintiffs' merchandise to be subjected to smoke damage which it would probably have escaped had the hatches been left open. As this sealing was part of "man's" effort to control the fire, such sealing—as I understand the applicable law—should call for the application of general average . . . .

See also *Sunkist Growers, supra.*

dioxide, and spraying water into the hatch were general average acts. *See Columbian Ins. Co., supra,* 38 U.S. (13 Pet.) at 338; *York-Antwerp Rules,* 1950, *supra* n. 4, Rule A. Defendant shipowners, therefore, must compensate plaintiff cargo owners for the contribution they would have received had a general average been declared.

SO ORDERED.