TREASURE SALVORS, INC., a corporation, and Armada Research Corp., a corporation, Plaintiffs,

v.

The UNIDENTIFIED WRECKED AND ABANDONED SAILING VESSEL, "NUESTRA SENORA DE ATOCHA," et al., and Olin Frick, John Gasque, William Riley, et al., Defendants.

No. 75–1416–Civ–SMA.

United States District Court,
S. D. Florida,
Key West Division.

July 2, 1981.

David Paul Horan, Key West, Fla., for plaintiffs.

Reginald M. Hayden, Hayden & Milliken, Miami, Fla., for defendants.

## MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARONOVITZ, District Judge.

A modern-day odyssey of the sea has again unfolded in the United States District Court, Southern District of Florida, at Key West, Florida, between opposing salvors and/or treasure hunters seeking to possess the wealth of Midas in a scenario of true life so spectacular as to relegate the sea tales of Herman Melville and the glamour of a Hollywood production to miniscule insignificance.

This battle over a shallow-water wreck site off the Keys and shoals of the Florida coastline has the drama associated with the high seas and involves the exercise of admiralty and maritime jurisdiction by this Court.

### Procedural Posture

In the initial chapter of this continuing saga, on June 13, 1975, Treasure Salvors, Inc. and Armada Research Corp. filed this in rem and quasi-in rem (on in personam principles) action in the United States District Court for the Southern District of Florida, seeking possession and confirmation of their title to the remains of an ancient shipwreck they had discovered, believed to be the Nuestra Senora de Atocha, or alternatively an award for salvage services. The United States intervened, counterclaiming for title to the vessel under the provisions of the Antiquities Act, 16 U.S.C. §§ 432 and 433, and the Abandoned Property Act, 40 U.S.C. § 310. The late Honorable William O. Mehrtens, Senior United States District Judge, entered summary judgment in favor of Treasure Salvors as against the United States, and also decreed that Treasure Salvors had sole title and right of possession to the vessel and its cargo "wherever the same may be found" (as against all claimants). See Treasure Salvors v. Abandoned Sailing Vessel, 408 F.Supp. 907 (S.D. Fla.1976). The Fifth Circuit affirmed inso-

far as the ruling resolved the competing claims of Treasure Salvors and the United States, but refused to approve that portion of the ruling which held that Treasure Salvors was entitled to sole and exclusive title and possession as "to other claimants, if any there be, who are not parties or privies to this litigation." Treasure Salvors v. Unidentified Wrecked, etc., 569 F.2d 330 (5th Cir. 1978) (Treasure Salvors I).

In a second and subsequent proceeding herein, Treasure Salvors and the State of Florida, Division of Archives, were opposing parties. In the belief that the Atocha lay on submerged land owned by Florida, Treasure Salvors had entered into a series of annual contracts with the State of Florida whereby Treasure Salvors was allowed to conduct salvage operations on the Atocha site with the State of Florida to receive 25% of the property recovered. During 1975, the U.S. Supreme Court rendered an opinion in U.S. v. Florida, 420 U.S. 531, 95 S.Ct. 1162, 43 L.Ed.2d 375 (1975), and subsequently U.S. v. Florida, 425 U.S. 791, 96 S.Ct. 1840, 48 L.Ed.2d 388 (1976). According to the Fifth Circuit in Treasure Salvors II, infra, at p. 1350, "In U.S. v. Florida, however, the Supreme Court held that [Florida's] ownership claim was without merit and that the lands never belonged to Florida."; and again in Treasure Salvors III, infra, at p. 563, "In 1975, the Supreme Court rejected Florida's claim to ownership of that portion of the continental shelf where the remains of the Atocha rest, United States v. Florida, 420 U.S. 531, 95 S.Ct. 1162, 43 L.Ed.2d 375 (1975)." Judge Mehrtens thereafter rendered judgment in favor of Treasure Salvors and against the State of Florida. Again the Fifth Circuit upheld the decision on the grounds that the contract between Treasure Salvors and Florida was invalid due to mutual mistake and a failure of consideration.[1] Treasure Salvors v. Unidentified Wrecked, etc., 459 F.Supp. 507 (S.D.Fla.1978), aff'd 621 F.2d 1340 (5th Cir. 1980), cert. granted 451 U.S. 982, 101

---

1. The District Judge and the Fifth Circuit further held that since they had found that Florida lacked an ownership interest in the artifacts, that Florida's asserted Eleventh Amendment rights were without merit. Treasure Salvors II, p. 1345.

S.Ct. 2312, 68 L.Ed.2d 838 (1981) (*Treasure Salvors II*). This matter remains pending on certiorari review in the United States Supreme Court.

The dispute presently before the Court is between Treasure Salvors and another Key West based treasure salvor group. Treasure Salvors initially defined the location of the wreck in terms of a circle having a radius of 2500 yards from a point at 24°31.-5′ North Latitude and 82°50′ West Longitude, where a large anchor believed to have come from the Atocha had been found. This description of the location was amended by Treasure Salvors on two subsequent occasions, the last amendment describing an area encompassing an axis from the initial point to a second point at coordinates 24°30′ North Latitude and 82°15′ West Longitude, where a second anchor, also believed to have come from the Atocha, was found, a distance alleged to be 9,750 yards from point to point, extending 2500 yards on each side of the axis. At the same time that this latter amendment was filed, Treasure Salvors sought and obtained a Temporary Restraining Order, claiming that Olin Frick, John Gasque, William Riley and the Masters of the motor vessels "Juniper" and "Seeker", rival salvors, were wrongfully interfering with Treasure Salvors' possession and salvage of the Atocha by conducting salvage operations of their own within 1500 yards of the point at which the second anchor was found and that threatening shots had been fired from aboard the Juniper. Judge Mehrtens subsequently issued a preliminary injunction, which prohibited the defendants from interfering with the search and salvage operations of Treasure Salvors and from searching for or salvaging within the area extending 2500 yards to either side of a line drawn between the two points where the anchors were found, that is, the points described in the amendment. Defendants appealed that Order.

The Fifth Circuit, after concluding that it had jurisdiction to review the Order issuing the preliminary injunction, held that the District Court did have jurisdiction to resolve the dispute between these parties. *Treasure Salvors v. Unidentified Wrecked,* *etc.*, 640 F.2d 560 (5th Cir. 1981) (*Treasure Salvors III*). The Court found that 28 U.S.C. § 1333, which grants federal courts jurisdiction over all cases involving admiralty or maritime claims, provided subject matter jurisdiction over the competing salvage claims of the parties, despite the fact that the remains of the Atocha lie outside the territorial waters of the United States. *Id.* at 566. The Court further found that the District Court had in personam jurisdiction over the defendants and that since the salvor's claim was not one against the vessel, the fact that the Atocha lay outside the territorial waters of the United States was irrelevant. Accordingly, the Fifth Circuit stated that the district court was "fully competent to adjudicate the dispute." *Id.* at 568.

Having concluded that the Order Granting Preliminary Injunction was appealable and that the district court had jurisdiction to enter the Order, the Fifth Circuit addressed the propriety of the preliminary injunction under the criteria set out in, *e. g., Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567 (5th Cir. 1974). In attempting this review, however, the panel felt hindered by the fact that the decision to issue the preliminary injunction had apparently been based on evidence adduced at previous hearings of which the district court had taken judicial notice, rather than evidence adduced at the hearing on the preliminary injunction, and that these prior proceedings had not been included in the record on appeal by the parties. Because of these deficiencies, the panel stated it was unable to determine what factors persuaded the district court that the *Canal Authority* prerequisites had been established. Thereupon, the Fifth Circuit concluded:

In light of these circumstances, we decline to conclude that the district judge, who had the benefit of much greater familiarity with the factual problems presented by the case than we have in view of the state of the record in this case, abused his discretion in entering this injunction. However, given the excep-

tional nature of this injunction, and the burdens it places on the defendants, we think that the merits of this dispute should be resolved as quickly as possible. For this reason, we modify the district court's preliminary injunction to provide that it shall expire no later than 90 days following the issuance of our mandate. Thus, the parties to the dispute and the district court should arrange for a final hearing on the merits of this controversy during that period.

Pursuant to the directions of the Fifth Circuit panel in *Treasure Salvors III*, a Final Hearing on Petitioners' Request for a Permanent Injunction was held over a four-day period. At the hearing, the Court received testimony and numerous exhibits in evidence, viewed a 47-minute National Geographic Society film on the Atocha search, saw more than 100 photo slides and heard testimony thereon, and had the benefit of counsel's oral argument as well as extensive memoranda of law. After considering all the aforegoing and the applicable law, and being otherwise fully advised in the premises, the Court sets forth herein its Findings of Fact and Conclusions of Law.

### Background

The *Tierra Firme Flota*, consisting of 28 ships, sailed from Havana, Cuba on September 4, 1622. Included among the galleons were the Nuestra Senora de Atocha and the Santa Margarita. The fleet was bound for Spain with cargo of gold and silver bullion, specie, tobacco, copper ore and indigo. In the Florida Straits the fleet encountered a hurricane which stripped masts, sails and rigging. One group of ships, including the Atocha and the Santa Margarita, were scattered and those two vessels were believed to have sunk within one (1) marine league or three (3) nautical miles of each other in the area now generally referred to as the Marquesas Keys.

When the Atocha left Havana she had as part of her cargo over 1 million pesos of registered bullion and specie aboard. She carried 901 silver ingots, 250,827 silver coins, 161 gold bullion pieces, 582 copper planks, some 350 chests of indigo, and 25 tons of tobacco in her registered cargo. The current value has been variously estimated at between 50 million and 200 million dollars.

A Spanish salvage effort was launched in 1622 as a result of which the hull of the Atocha was located in about 55 feet of water intact with her mizzen mast projecting above water. The salvage party used the Marquesas Keys as the base of its salvage operations naming them after the Marques of Cadereita who personally directed the search from the salvage camp. Only minor recovery of items and articles occurred before a second hurricane intruded, resulting in a breakup of the hull, a dispersal and removal of the surface buoys and a resultant loss of the site of the sunken ship. Several other salvage attempts occurred in the mid 1600's and although somewhat successful with regard to some items recovered from the Santa Margarita, results were unproductive in attempting to locate the Atocha.

In the mid 1960's, substantial efforts were renewed to locate the Atocha but this search by a number of treasure hunters occurred in the middle Keys and in the vicinity of Matecumbe Key, many miles away. It was unproductive until, as later referred to herein, Dr. Eugene Lyons, working for Treasure Salvors, unearthed a clue in the Archives of the Indies in Seville, Spain, and first focused Mel Fisher and Treasure Salvors to the search near the Marquesas Keys.

### Site Location

The so-called injuncted area overlaps the site concerning which the State of Florida had granted to Treasure Salvors exploration rights (site 8MO141). The injuncted area lies 9.25 miles west, southwest of the Marquesas Keys. The latter Keys are approximately 40 miles west of Key West, Florida, and approximately 35 miles east of Dry Tortugas. The injuncted area lies wholly within the contiguous sea zone. The territorial sea extends in an arc 3 miles west of the westernmost land of Marquesas

Key. Thereafter, the contiguous zone extends seaward for an additional 9 miles, together comprising what is familiarly referred to as the twelve-mile zone (limit). *See* Plaintiffs' Exhibit 8 and Defendants' Exhibit 5.

The so-called injuncted area consists of approximately 13.3 square miles in the Gulf of Mexico.[2] This is the area described in the Temporary Restraining Order (December 11, 1979) and in the Preliminary Injunction (January 7, 1980) as the area extending 2500 yards to either side of a line drawn between two points, the first located at 24°31.5′ North Latitude and 82°20′ West Longitude, the second point located at 24°30′ North Latitude and 82°15′ West Longitude. State of Florida site 8MO141 embraced approximately 18 square miles. *See* Plaintiffs' Exhibit 10 for a more detailed site description, page 22.

According to the Constitution of the State of Florida (F.S.A.Const. Art. 2, § 1), the boundaries of the State of Florida include an area set forth as follows:

[I]n a southerly direction along the edge of the Gulfstream or along a line three geographic miles from the Atlantic coastline and three leagues distant from the Gulf of Mexico coastline, whichever is greater, to and through the Straits of Florida and westerly, including the Florida reefs, to a point due south of and three leagues from the southernmost point of the Marquesas Keys; thence westerly along a straight line to a point due south of and three leagues from Loggerhead Key, the westernmost of the Dry Tortugas Islands; thence westerly, northerly and easterly along the arc of a curve three leagues distant from Loggerhead Key to a point due north of Loggerhead Key; thence northeast along a straight line to a point three leagues from the coastline of Florida; . . .

Within this definition the Marquesas Keys are Florida territory, subject to the declaration by the United States of the Marquesas Keys as a wildlife refuge[3] by virtue of which the United States claims jurisdiction over the uplands above the mean high water mark constituting the Marquesas Keys, *i. e.*, effectively the entire Marquesas Keys.

### Is It The Atocha?

In addressing this question it is first necessary to treat briefly the differences existing between shallow-water wreck sites and deep-water wreck sites. Most frequently the thought process is directed towards wrecks such as the Titantic and the Andria Dorea, which are of relatively recent origin and lie in hundreds of feet of water substantially intact with hull and super-structure at a single site. In sharp contrast, a shallow-water wreck site found off the coast of Florida lies in or on the continental shelf, in or on shoals or keys, on bedrock or covered by many feet of overburden such as sand, mud or seagrass. The waters are relatively shallow and lend themselves to scuba diving and modern techniques of recovery.

In some shallow-water wrecks the hull or significant portion of a lost vessel has been found, but research has brought recognition that over 350 years a wooden galleon disintegrates, is dispersed and passed along the shoals and shallow waters, driven by the hurricanes that visit the area, the currents and natural phenomena, which would result in substantial dispersal or "scatter" of the wreck site. Actually, this dispersal usually takes the form of a corridor from which quantities of artifacts are found, including ballast and cargo, as well as pieces of wood, metal fasteners, hooks, anchors and other artifacts of ship and cargo. It may well be

---

**2.** *See* Defendants' Exhibit 5 and testimony at Tr. 115,116. Although this is the figure computed by Defendants in the said exhibit and their testimony, it appears that the injuncted area may cover approximately 15.5 square miles. However, both sides in these proceedings seem to accede to the 13.3 square mile area as the accepted injuncted site dimensions. The disparity in area may be caused by the fact that the actual straight line distance between the two points of the axis (anchors) is less than 9,750 yards as alleged by Plaintiffs.

**3.** *See* 16 U.S.C. §§ 668dd, 668ee.

that a given wreck over a 350 year period can produce more than one scatter pattern over thousands of yards each, and therefore more than one corridor caused by the travel left from initial impact, subsequent dispersals and later impact areas.

This difference between shallow-water and deep-water wrecks explains the difficulties encountered in pinpointing a specific location for salvage and would require, even with advanced, modern technology, a sufficient area of salvage and search as well as a time span to allow retrieval from a primary impact or deposit area, which may cover square miles of the sea.

From within the injuncted area plaintiffs have recovered several silver ingots. Three (3) of these ingots were compared with entries in the manifest and registry of the Atocha. They corresponded in tally number, weight and silver fineness to entries on the registry. One (1) of the three (3) bars also has inscribed upon it the same shipping mark as that written in the margin of the registry document for the bar matching that design on the registry of the Atocha.

Nine (9) bronze cannons were found within the injuncted area in July, 1975, and all have been recovered. Four (4) of these cannons bear foundry weight numbers inscribed on the breech molding or on the vent field and those numbers tally with weight numbers of four (4) guns assigned to the Atocha and listed in the "Guard Fleet" artillery for that ship ("*Agi Indiferente General 1144*"), Plaintiffs' Exhibit 11. All told, more than 20,000 artifacts have been recovered in and around the injuncted area from 1971 to date, including thirty-four (34) muskets and arquebusses, forty-four (44) swords, fifteen (15) daggers, eight-hundred fifty (850) body sherds, fifteen (15) vessel rims (olive jar assemblage), tin-glaze earthenware, gold necklaces, more than six thousand (6000) silver coins, and ballast stones. The present value of the recovered artifacts is $8,000,000.00. The search has resulted in a present day recovery by plaintiffs of an estimated aggregate 5% of the artifacts of ship and cargo. Approximately 3% of the silver coins have been recovered.

Using a confluence of factors for identification purposes, including the matching of certain items to the ship's manifest, but also established archeological techniques to date the eras of time during which the various artifacts such as the swords, the sherds, the silver coins and other items are dated, has resulted in what is solid evidence attesting that the wreck site area contains the remains of the Atocha and that some, if not all, of the artifacts derive from the Atocha through recovery from the scatter pattern emanating from her shallow-water resting site. Whether or not a significant portion of the hull or super-structure exists after 350 years of exposure to the elements is problematic. However, even defendants believe that a significant portion of the hull remains intact and will be found beneath the 15 to 20 feet of sand. The plaintiffs agree. This general agreement is strengthened by the fact that in 1980, at a location approximately three (3) miles east of the injuncted area, parallel thereto and in an obvious scatter zone pattern, an 8 × 14' section of the super-structure or hull of a sister ship of the Atocha, namely the Santa Margarita, has been found and identified even more precisely than the evidence of identification available as to the Atocha. *See* the photo-mosaic of the remains of the Santa Margarita, Plaintiffs' Exhibit # 20.

### The Salving/Search Effort

From 1971 to date, Plaintiffs have expended approximately $7.1 million dollars in salvaging and search operations for the Atocha in and about the injuncted area. The 1980 budget alone was $1,100,000.00. This has included, at varying times, as many as seven (7) vessels in operation, sixty (60) personnel, and the digging of hundreds of excavation sites. Plaintiffs have placed hundreds of surface and sub-surface buoys and have established grid lines criss-crossing the bottom over many square miles to form a basis for directing salvage and excavation of finds and further activity. The use of surface buoys and bottom grid lines has extended from an area of a radius of 500 meters from the original point of dis-

covery of the first anchor in the injuncted area and beyond in various directions an additional 800 to 1200 meters. The bottom grid lines and surface buoys have been renewed from time to time in selected zones. They have been serviced and some replaced at varying times. Four (4) theodolite towers have been placed in the area to aid in survey and location. Sonar scan devices have been used throughout that time frame. Scores, if not hundreds, of aerial reconnaissance photos have been taken in the wreck site area and satellite photos have been scanned for leads. One of the seven (7) vessels (*Arbutus*) used by plaintiffs has been anchored on site within the injuncted area continuously since 1975. From testimony adduced, the recovery efforts have continued and persisted in varying intensity at all times from 1971 to date, and the recovery of more than 20,000 artifacts attests to the success of those efforts.

Convincing testimony established a continuing presence of Treasure Salvors through its agents and employees and its vessels within the injuncted area, and further established that at no time has it ever abandoned the recovery efforts as relates to the Atocha. Treasure Salvors has met its burden of proof to establish "occupancy" of the injuncted area and particularly the area in and around the first anchor site. It has taken possession and exercised dominion and control over the artifacts it has recovered and the general area of its salvage and search operations. Its presence has not been transitory. At minimum, Treasure Salvors has taken constructive possession of the wreck site as the nature and situation permit. *Eads v. Brazelton*, 22 Ark. 499 (1861); *Treasure Salvors III*, pg. 572.

### Equities

As noted above, this Court has found that Treasure Salvors has expended considerable sums of money and dedicated vessels and manpower, as well as substantial equipment and efforts, to establish possession and control of the injuncted area and the wreck site. It was the first to do so, at least according to testimony before this Court. Its presence has been continuous.

■ The law protects not only the title generally acquired by one who finds lost or abandoned property but also the right of the person who discovers such property and who is actively and ably engaged in reducing it to possession, to complete this project without interference from another. *Treasure Salvors III*, pg. 572. It is clear from the evidence that prior to 1971, Treasure Salvors and many other interested salvors in the recovery of the Atocha had explored sites in the Atlantic Ocean, off the Florida Keys, in the Bay of Florida, along the Gulf of Mexico boundary of the Florida Keys, including Matecumbe Key. However, it is equally clear and convincing from the evidence before this Court that Mel Fisher and Treasure Salvors made the first major, primary effort to direct their attention to exploration in the Marquesas Keys area as a result of Dr. Lyons' discovery in the Archives of the Indies in Seville, Spain. On a trial and error basis, Treasure Salvors spent many months and years in areas east, as well as west, of the Marquesas. During that time it finally isolated a promising, productive and responsive area now delineated as the injuncted area, as the likely recovery site of the Atocha. For all intent and purposes, Treasure Salvors and/or Mel Fisher has acquired the rights of first finder of lost or abandoned property, has been and is actively and ably engaged in reducing it to possession. It is engaged in a salvaging operation coupled with the discovery procedure that goes with a "finds" situation which has developed over 350 years through the formation of the scatter pattern corridor of the shallow-water wreck of the Atocha.

As it relates to the rights of these defendants in these proceedings, this Court finds as a matter of fact and law that the current efforts of the defendants commencing in December, 1979, to salvage or seek the Atocha within the injuncted area, arises from information and/or facts made known to these defendants by the plaintiffs. The defendants engaged in a contract salvage operation for the plaintiffs in 1976, to raise

from the bottom several cannons recovered from the Atocha site. They therefore learned the pin-pointed area from information divulged to fulfill defendants' contract with plaintiffs. Likewise, admittedly these defendants knew that plaintiffs claimed the Atocha was within the subject area because two contracts introduced into evidence, namely, Plaintiffs' Exhibits 2A and 2B, clearly established that defendants had knowledge that the Atocha was the alleged subject of the salvage operations of the plaintiffs within the injuncted area.

■ Equally as important is the finding herewith made that these defendants neither had the capability to, nor did they historically cultivate information to direct them to the site in the Marquesas Keys. They relied solely on information divulged to them by plaintiffs and learned from on-site salvage operations for plaintiffs. Quite to the contrary, the evidence is conclusive that the plaintiffs did engage in systematic search elsewhere for the Atocha prompted by historical review and archeological study, which ultimately lead to the information which produced the current site. The equities, therefore, in this respect are completely with the plaintiffs and against the defendants. To permit the defendants indiscriminately to compete with plaintiffs and without protection to the first finder, would constitute unjust enrichment of the defendants. As Judge Mehrtens held in his Order of Summary Judgment dated February 2, 1976:

Plaintiff asserts that, where a vessel has been abandoned, the finder in possession becomes the owner of the vessel. Such a claim is properly within the scope of a salvage action. *Broere v. Two Thousand One Hundred Thirty Three Dol.*, 72 F.Supp. 115 (E.D.N.Y.1947). General principles of maritime and international law dictate that an abandonment constitutes a repudiation of ownership, and that a party taking possession under salvage operations may be considered a finder under the doctrine of "animus revertendi," i. e., the owner has no intention of returning. *Wiggins v. 1100 Tons, More*

*Or Less, Of Italian Marble*, 186 F.Supp. 452, 456 (E.D.Va.1960). Ownership in the vessel would then vest in the finder by operation of law. *Rickard v. Pringle*, 293 F.Supp. 981, 984 (E.D.N.Y.1968), citing *Wiggins*, supra, and 1 C.J.S. Abandonment § 9, p.18. Thus, those beginning a salvage service as to an abandoned vessel are entitled to sole possession of the property. See *Rickard v. Pringle*, supra, at 985, citing *The John Gilpin*, Fed.Cas.No. 7,345 (S.D.N.Y.), and *Brady v. The Steamship African Queen*, 179 F.Supp. 321, 323 (E.D.Va.1960).

■ It is well recognized in this Circuit that three elements must be established in order to present a salvage claim:

(1) A marine peril;

(2) Service voluntarily rendered when not required as a pre-existing duty; and

(3) Success, in whole or in part, of recovery of the imperilled property.

*Legnos v. M/V Olga Jacob*, 498 F.2d 666, 669 (5th Cir. 1974). The activities of Treasure Salvors with respect to the wreck of the Atocha satisfy all these elements and therefore is a salvage operation within the meaning of the law. A marine peril "includes more than the threat of storm, fire or piracy to a vessel in navigation." *Treasure Salvors I*, p. 337. The concept of marine peril also includes a vessel which is discovered after being long lost but is "still in peril of being lost through actions of the elements." *Id.* Accord, *Platoro Ltd., Inc. v. Unidentified Remains, etc.*, 614 F.2d 1051 (5th Cir. 1980).

## Archeological Impact

The uncontroverted evidence shows that plaintiffs have exhibited a keen awareness of the historic and archeological importance attributed in general to old wreck sites, but specifically to the Atocha and Santa Margarita sites. Over the course of the years plaintiffs have associated at least one archeologist and/or associates, a historian and assistants, for the purpose of being present and recording finds of artifacts, the locations, the condition of the artifacts, the

listing thereof, the taking of preservative steps and restorative efforts and protection of the public in viewing archeological finds. This has included substantial expenditures for such historical and archeological services, the providing of working space for archeological personnel with storage facilities such as wet storage tanks, laboratories, chemicals and supplies (see Plaintiff's Exhibit 17 and the testimony of R. D. Matthewson, Archeologist). Very substantial efforts have been maintained and strict control measures introduced to preserve the public interest in the protection of the historic and archeological values associated with the finding of the Atocha and the Santa Margarita. These efforts constitute a significant equity favoring the plaintiffs in the relief sought, because it is quite apparent that the defendants have no comparable capability, nor have defendants sought to achieve such a capability. Testimony was adduced tending to establish that to allow competing salvors to criss-cross their own paths through the wreck site area could result in substantial disturbance of the historical and archeological capabilities by preventing chronological, comprehensive mapping, studying, preserving through photographs and otherwise, the full value of the corridor. This would diminish the capabilities of the archeologists to recreate with authenticity the full spectrum of life, represented by the wrecks and the wreck sites in the early 17th century.

Archeologist Matthewson expressed the intertwined relationship of search, salvage and archeology as follows: (Tr. p. 624)

> Search is very much part of the salvage efforts. I cannot really understand what happened to a shipwreck without digging, without salvage. Search, salvage, ongoing research, archeological mapping is all part and parcel of a whole operation.

### Jurisdiction

■ This Court has jurisdiction over the *subject matter* pursuant to the Constitution of the United States, Article III, Section 2, Clause 1, 28 U.S.C. § 1333, and Rule 9(h) Fed.R.Civ.P., as a case involving an admi-

ralty and maritime claim. Claims arising out of salvage operations are unquestionably within the admiralty jurisdiction of the federal courts. "The subject matter jurisdiction thus granted is not limited to causes of action arising from acts or occurrences on the territorial waters of the United States." *Treasure Salvors III,* pp. 566–67.

This Court has *in personam* jurisdiction of both sides to this controversy who are before the Court by virtue of process duly served and issues thereon raised. Both sides concede in personam jurisdiction although this would not in itself vest jurisdiction. The Fifth Circuit held in *Treasure Salvors III,* at p. 566:

> The district court has jurisdiction to adjudicate the dispute between Treasure Salvors and the Frick group because it has perfected its in personam jurisdiction over the parties to this dispute and because it has jurisdiction over the subject matter of the controversy pursuant to 28 U.S.C. § 1333.

Whether or not this Court has jurisdiction *in rem* is a more complex question. Upon the answer to this question, however, does not necessarily rest the jurisdiction of this Court to consider or grant injunctive relief exercised over the parties in personam. And as the Fifth Circuit stated in *Treasure Salvors I,* at p. 334:

> However, as commentators have noted, the Supreme Court appears to favor the position that the presence of the *res* within the district is not an absolute prerequisite to the court's jurisdiction.

*See also* footnote 4 in same Opinion. Both Judge Mehrtens and this Court have characterized the plaintiffs' pending action as a proceeding in rem or quasi-in rem (founded upon in personam principles). There are several persuasive factors:

(a) More than 20,000 artifacts have been located in and around the injuncted area, have been recovered, and at one time, or now, have been, or are within the Southern District of Florida. This constitutes about 5% of vessel and cargo. It is a significant recovery of portions of the vessel. The Court has physical possession of significant

items attributable to the injuncted area wreck site.

(b) Through the substitute custodians appointed by this Court who are in physical presence and control at the injuncted area by vessels, divers, equipment and otherwise, it can be said that this Court has the injuncted area wreck site *in custodia legis. See Treasure Salvors I*, fn. 5, p. 335.

(c) The injuncted area wreck site lies wholly and exclusively within the waters of the contiguous zone. It is in the Gulf of Mexico. Portions of the injuncted area may lie within three (3) marine leagues of the Marquesas Keys. *See U.S. v. Florida, supra.* Under the Convention on the Territorial Seas and the Contiguous Zone the coastal State has certain customs, fiscal, immigration and sanitary regulation authority within the contiguous zone. *See Treasure Salvors I*, fn. 14, p. 338; *U.S. v. Gunnar Williams, et al.*, 617 F.2d 1063, 1096 (5th Cir. 1980), wherein the Fifth Circuit pointed out that the contiguous zone should be considered the functional equivalent of the border. The United States has search and seizure prerogatives therein as well, certainly over American flag vessels. The contiguous zone therefore affords an area of limited U.S. jurisdiction.

(d) There is actual possession and occupation of the wreck and wreck site to the extent practicable, and certainly constructive possession of the wreck by operation of law. At the least, the Court has *qualified* in rem jurisdiction.

■ This Court has jurisdiction over that portion of the wreck within its territorial jurisdiction and a reasonable likelihood exists that other portions constituting a significant additional salvaging result will be within the territorial jurisdiction of this Court. Consequently, as a result of the aforegoing factors, and quasi-in rem jurisdiction on in personam principles, this Court has, at least, *qualified jurisdiction in rem* at this time, which is likely to ripen into full in rem jurisdiction.

### Injunctive Relief

It is apparent that the plaintiffs have established that they will be irreparably harmed if the temporary injunction is not extended. The plaintiffs' financial investment, their efforts represented by vessels, personnel, equipment and work within the injuncted site, support their claim. Even loss of life has contributed to their equities. As "finders" they have established their rights. More than that, they have protected their find by diligent exercise of salvaging efforts. To allow others at this time to come in and reap the benefits that are bestowed upon a finder and/or salvagor in these circumstances would constitute irreparable harm and injury for which there would be no adequate remedy at law. In terms of the public interest, the dedicated archeological and historic efforts by the plaintiffs in preservation of the wreck sites, unqualifiedly suggests that the public can best be served by allowing these plaintiffs to continue their efforts further.[4]

The troublesome aspect of granting the relief sought arises not from defendants' argument that the sea is vast and that finders are keepers and that no one should be prevented from treasure hunting on the high seas. This poses the question of how one goes about seeking an exclusive right to search and salvage an area of the high seas lying within the contiguous zone. This injunctive action, however, is more limited.

---

4. Both sides adduced considerable testimony describing incidents in which the opposing salvors would confront each other under circumstances wherein a "face-off" has been narrowly averted. These incidents occurred in December, 1979, and in March, 1980, in the injuncted area. In the first instance a salvo of gunshots were fired into the air as a warning by the defendants. There were no contempt proceedings pending before the Court which would necessitate a determination as to whether or not the incidents constituted a violation of the injunctive order. Suffice it to say, the testimony established clearly the inherent dangers of these opposing salvage groups confronting each other in an area which represented the injuncted area in size. The necessity to avoid such confrontations is an equitable factor when considering the irreparable harm to the plaintiffs. It therefore affords a basis of an additional factor mitigating in favor of the type of relief herein granted.

It relates only to the rights of *these* opposing parties.

The answer is found in the principles of admiralty and maritime law which merge the rights of a finder and a salvor and give rise to the type of protection which the plaintiffs seek herein against these defendants. The difficulty lies not so much in recognizing under maritime law, the equities of the situation, but in the fashioning of relief in a manner which does not do violence to freedom of navigation and travel on the high seas and the other basic rights of the world at large to use and travel the high seas. The question provides its own solution. *It resolves itself into determining a reasonable area for use by the finders and/or salvors for a reasonable time* as against *these* defendants. This should be under circumstances wherein possession, dominion and control are asserted and maintained.

■ What then is a reasonable area? The testimony in this trial indicates that 50 to 60 square miles would more likely produce full and productive results. Such an area may have actually been searched by plaintiffs, but it has not been requested, nor is it the size of the present injuncted area. The injuncted area is 13.3 square miles, or 9,750 yards in length by 5,000 square yards in width. What does the State of Florida grant in terms of exploratory rights relating to wrecks within the sovereign land jurisdiction of that State? Well, site 8MO141 was approximately 18 square miles in area. Again, for what length of time would the State contract with salvor? Annual contracts (renewable). Translating all factors and considering the evidence as it applies to the injuncted area this Court finds that the present injuncted area is adequate, fair and reasonable in terms of size; that it affords the plaintiffs an adequate and reasonable area within which their already acquired rights may be pursued as against these defendants. This does not necessarily mean that in every instance wherein such type of relief is sought that the injuncted area should constitute a tract of 13.3 square miles. Rather,

it is this Court's finding based upon the evidence before it, that the nature of the shallow-water wreck, its scatter patterns, the production resulting from search of the areas, and the likelihood of the area required for success is the area represented by the present injunctive site of 13.3 square miles.

Should the injunction be made permanent? Should anyone receive a permanent right to keep someone else out of an area of the high seas lying within the contiguous zone forever? The answer is no. But this does not prevent relief from being granted after considering all of the factors that may be applied to the answer to this temporal question. When considered in light of the fact that hurricane seasons exist and occur normally over the course of several months embracing the injuncted area and that sea conditions during some winter months are at times stormy and not as conducive to salvaging operations as during other periods of time, it would appear then an extension of the existing temporary injunction for an additional eighteen (18) months would be fair and reasonable. This would give the plaintiffs an opportunity to pursue their endeavors, which have been earned and are deserving. On the other hand, it would afford an opportunity to the plaintiffs and defendants to return to this Court to review whether or not plaintiffs have diligently maintained their rights to seek a continuance of the injunction. Although the trial on the merits has been held, and notwithstanding the request for a permanent injunction, it is within the sound judicial discretion of this Court to grant the relief requested in the form of an extension for a limited period of time as herein set forth. *Winston Research Corp. v. Minnesota Mining and Manufacturing Co.*, 350 F.2d 134 (9th Cir. 1965). "Appropriate relief . . . is to be determined on a case-by-case basis . . . with relief tailored in each instance to the needs of the particular situation." *U.S. v. Jamestown Center-in-the-Grove Apartments*, 557 F.2d 1079, 1080 (5th Cir. 1977). "Furthermore framing an injunction appropriate to the facts of a particular case is a matter peculiarly within the discretion of

the district judge." *J. M. Fields of Anderson, Inc. v. Kroger Co.*, 330 F.2d 686, 687 (5th Cir. 1964); *Gore v. Turner*, 563 F.2d 159 (5th Cir. 1977).

Accordingly, a Final Order will issue under even date herewith granting an extension of the present Injunction within the framework of the present injuncted area for an additional period of Eighteen (18) Months herefrom.

## FINAL ORDER

Upon the basis of the evidence adduced at a Final Hearing herein and pursuant to and in accordance with the Memorandum Opinion of this Court issued under even date herewith, which includes the Findings of Fact and Conclusions of Law of the Court, it is thereupon

ORDERED AND ADJUDGED that the existing Injunction heretofore termed a Preliminary Injunction issued under date of January 7, 1980, by the late Honorable William O. Mehrtens, Senior United States District Judge, be and the same is hereby EXTENDED for a period of Eighteen (18) Months from the date hereof and shall encompass the area described therein. It is

FURTHER ORDERED AND ADJUDGED that during said extended term of the Injunction OLAN FRICK, JOHN GASQUE, WILLIAM RILEY, and the Masters of the Motor Vessels "JUNIPER" and "SEAKER" shall not interfere with the search and salvage activities of the Plaintiff corporations nor search for nor recover objects from within 2500 yards to either side of two points and the line drawn between them, the first point being located at 24°31.5′ N. Latitude and 82°20′ W. Longitude, the second point being located at 24°30′ N. Latitude and 82°15′ W. Longitude until further Order of this Court. It is

FURTHER ORDERED AND ADJUDGED that Plaintiffs shall recover from Defendants their costs as provided by law, to be assessed by the Clerk of this Court in accordance with a Bill of Costs form to be filed herein.

## ORDER

Under date of July 2, 1981 (docket entry # 168), this Court issued its MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW in this matter. At page 924, this Court stated as follows in the Memorandum Opinion:

"The so-called injuncted area consists of approximately 13.3 square miles in the Gulf of Mexico."

Again, at page 924 of the said Memorandum Opinion, this Court stated:

"The [injuncted area wreck site] is in the Gulf of Mexico."

It is now apparent to the Court that under ruling of the United States Supreme Court in *U. S. v. Florida*, 420 U.S. 531, 95 S.Ct. 1162, 43 L.Ed.2d 375 (1975), and subsequently in *U. S. v. Florida*, 425 U.S. 791, 96 S.Ct. 1840, 48 L.Ed.2d 388 (1976), and the Report of the Special Master, Albert B. Maris, filed as part of the record in that case on February 19, 1974, that in fact, the injuncted area does not lie within the Gulf of Mexico but rests entirely within the contiguous sea zone of the Atlantic Ocean (although close to its boundary with the Gulf of Mexico).

The aforegoing change does not in any way alter the Memorandum Opinion nor any of its Findings of Fact or Conclusions of Law and, thereupon the Memorandum Opinion, including Findings of Fact and Conclusions of Law is hereby Ratified, Affirmed and Approved with the modification herein noted.